445 So.2d 1198 (1984)
STATE of Louisiana
v.
Donald Wayne WRIGHT.
No. 82-KA-2012.
Supreme Court of Louisiana.
January 16, 1984.
Rehearing Denied February 15, 1984.
*1199 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Nathan Stansbury, Dist. Atty., Michelle Jackson, Asst. Dist. Atty., for plaintiff-appellee.
Hank Seldon Hannah, Hannah, Cook & Kaufman, Lafayette, for defendant-appellant.
BLANCHE, Justice.
Defendant was arrested and indicted for the murder of his wife in a Lafayette motel room on December 6, 1981. After a jury trial, defendant was found guilty of second degree murder and sentenced to life imprisonment. From that conviction, defendant has appealed, alleging eight assignments of error.

FACTS
The events leading to the death of defendant's wife began on December 3, when Donald Wright arrived in Lafayette from his home in Center, Texas to attend a two-day drilling school sponsored by his employer. At the time of his arrival, he was accompanied by a female companion, one Trina Honnicut. Defendant apparently slept with Ms. Honnicut in his motel room on the first night; however, on the following evening, he was joined in Lafayette by his wife, Virginia Lee Wright. The purpose of this visit is somewhat unclear. According to defendant, he and his wife enjoyed a great deal of extramarital sexual freedom, and Mrs. Wright was coming to Lafayette to "go out and be picked up by another man." Tr. Vol. 3, R., p. 421. The Wrights went out on the evening of December 5 in separate cars. At some later stage of the evening, defendant returned to the motel and began arguing with his wife.
At approximately 5:30 a.m. on December 6, 1981, defendant called the front desk of the motel and requested an ambulance. Police arrived twenty minutes later and found Mrs. Wright lying on one of the beds, bleeding profusely from the mouth and ear. Defendant told police at the time that he and his wife had been arguing, and that in attempting to rise from the bed, Mrs. Wright fell and struck her head on the floor. Mrs. Wright was taken to a nearby hospital where she was examined by Dr. Thomas Bertuccini, a neurosurgeon. Dr. Bertuccini performed emergency surgery to relieve the victim's internal hemorrhaging, and found two fractures of the victim's skullone at the base of the skull, and another of the temporal bone behind the right ear. Despite the efforts of the surgeons, Mrs. Wright died of cardiac arrest within three hours of arrival.
Subsequent to Mrs. Wright's death, an autopsy was conducted and the cause of death determined to be hemorrhaging as a result of the basilar skull fracture. In addition, the coroner found a number of bruises on the victim's legs and right breast. In response to police questioning, the coroner expressed the view that the victim's injury was inconsistent with a fall from a bed. Thereafter, defendant was placed under arrest for the murder of Mrs. Wright.
After being taken into custody, defendant made a taped statement to police in which he described returning to the motel to find his wife in bed with another man. A violent argument then began between *1200 defendant and his wife during which the defendant admitted slapping her. However, defendant maintained that during this episode his wife accidentally slipped and fell from the bed injuring her head.
At trial on the merits, the prosecution introduced no eyewitnesses, but relied on the testimony of several expert witnesses. Both the operating surgeon and the coroner testified that it was highly improbable that an injury as severe as Mrs. Wright's could have been incurred by a fall from a 20" high bed. On cross-examination, however, both physicians admitted that such an injury was within the realm of possibility from the fall in question. The defense offered three expert witnesses, qualified in neurosurgery and neuropathology. The first witness had treated Mrs. Wright for a previous skull fracture in 1973 and indicated that Mrs. Wright may have had a pre-existing weakness in the skull as well as a continuing difficulty in balancing herself. The other two witnesses testified that the earlier injury could have contributed to the fatal fracture and that it was a reasonable hypothesis that a fall from 20" onto the motel room floor had caused the skull fracture.
Defendant also took the stand in his own behalf, and testified to facts slightly different from those given in his previous statements. At trial, defendant explained the promiscuous nature of his marriage, and stated that he and his wife had planned for her to meet another man in Lafayette. The argument with his wife ensued, he claimed, when he found his wife performing oral sex on the mana practice the Wrights had apparently agreed to reserve for one another. Defendant once more admitted to slapping his wife and shaking her; however, his testimony as to the fall was essentially the same. Defendant claimed his wife tried to stand on the bed and lost her balance, falling backwards onto the floor.
After hearing this testimony, the jury was retired at 11:00 p.m. on the second day of trial. At 3:00 a.m., the jury returned with a verdict of guilty of second degree murder.

Assignment of Error Nos. 1 and 2
By these assignments, defendant complains of conduct by the trial judge which defendant contends constitutes improper comment on the evidence. The conduct in question occurred while the defendant was testifying on direct examination. According to defendant, the trial judge abruptly left the bench, without ordering a formal recess or offering any explanation to the jury. Defendant maintains that the unexplained behavior, coming as it did at a crucial point in defendant's testimony, amounted to non-verbal comment on the credibility of defendant's testimony. On the other hand, the state contends that the trial judge made no comment remark, or other inference which indicated in any way her disbelief of defendant's testimony. The record itself shows that after the defendant had finished describing the condition of his wife on the floor of their motel room, the court stated:
"Excuse me. I hate to interrupt. We're going to take a short recess. The court will be in short recess."
We find that this assignment lacks merit. At the conclusion of the recess, defendant moved for a mistrial. In denying the motion, the trial judge explained that the recess was provoked by her concern that the defendant was about to lose control emotionally on the stand, as he described his attempts to assist his dying wife. While an outburst of this nature may or may not have been imminent, we consider such action within the trial judge's discretion if the judge reasonably believed it was necessary in order to maintain the composure of a witness so as to preserve order in the courtroom.
Defendant correctly points out that improper comment on the evidence may constitute reversible error. State v. Lonigan, 263 La. 926, 269 So.2d 816 (1972), State v. Green, 231 La. 1058, 93 So.2d 657 (La.1957). Clearly, in some instances, nonverbal conduct could constitute comment on the evidence. Furthermore, a trial judge, while possessing much discretion to regulate the time and number of recesses, *1201 should expressly refrain from interrupting the crucial testimony of a witness where a recess is not requested by a party and is not demanded by an emergency.
We do not consider that the recess called by the trial judge in this case constituted an impermissible comment on the evidence. Defendant has simply not made a sufficient showing of prejudice created in the minds of the jury so as to constitute abuse of the trial court's discretion.
This assignment of error lacks merit.

Assignments of Error Nos. 3, 4 and 5
In assignments three and four, defendant maintains that the specific intent element of second degree murder was not proven by the state, and that no reasonable trier of fact could have concluded from the evidence presented that defendant was guilty beyond a reasonable doubt of second degree murder. Because these two assignments are inextricably bound up with the issue of sufficiency of the evidence, we will discuss them together with assignment of error number five: whether, viewing the circumstantial evidence of the case in the light most favorable to the prosecution, every reasonable hypothesis of innocence was excluded.
The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. Where circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 mandates that: "Assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."
This Court has recognized that R.S. 15:438 is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis for the conviction. State v. Austin, 399 So.2d 158 (La.1981). Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. R.S. 15:438 provides an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. Exclusion of every reasonable hypothesis of innocence is therefore a component of the more comprehensive reasonable doubt standard, where circumstantial evidence is used to convict. As we stated in State v. Chism, 436 So.2d 464 (La.1983). La.R.S. 15:438 "may not establish a stricter standard of review than the more general reasonable juror's reasonable doubt formula, [but] it emphasizes the need for careful observance of the usual standard, and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence."
Having set forth the test, we now examine the evidence to determine whether the hypothesis of an accidental fall was in fact reasonable. The state offered two medical witnesses to demonstrate the unlikelihood that the victim's injuries were caused by an accidental fall. The first witness, the operating surgeon, testified that the skull fracture suffered by Mrs. Wright was one most often seen in traumas arising out of automobile accidents. When asked whether a basilar skull fracture could have occurred from a fall off of a bed onto a carpeted surface, the doctor stated:
"I cannot exclude it as a possibility. But having had experience with rather massive head injury in the past and knowing the circumstances under which they happened, I think it would be very unlikely that this would have occurred from a fall off a bed, particularly if there were a fall onto a carpeted area." Tr. p. 165.
On cross examination, the doctor admitted again that a fall could have caused the *1202 injury, although he considered the probability remote.
The second witness offered by the state, the coroner who performed the autopsy on Mrs. Wright, corroborated the testimony of the surgeon. The coroner stated that the impact force from a fall of 20" would be very mild and was not a likely explanation of the victim's injuries.
By contrast, the defense maintained that the theory of an accidental fall was equally reasonable. To support this hypothesis of innocence, the defense called two neurologists, both of whom were board certified in neuropathology and had performed innumerable autopsies. The first expert witness, Dr. Kenneth Earle, testified that he not only considered the explanation offered by defendant as a possible explanation, but considered it a reasonable hypothesis to explain the victim's injuries. When asked how likely an injury of the sort incurred by the victim would be, given the distance and the surface of impact, the doctor responded:
You can't mathematically say, but I can say that in my experience it is not at all uncommon for someone falling a distance of no more than a few feet, impacting on a fairly solid object such as a concrete floor or even a carpeted floor and this lady was over five (5) feet tall... If she was in an almost vertical position, and was almost two (2') feet off the ground, this is a considerable distance for a hundred and ten (110) pound weight to impact on the pavement. And it is my impression that this is what occurred and that the basilar fractures were complicated even more by the fact that this lady had previous fractures of the basilar skull in 1973.
Transcript, pp. 372-3. The second witness for the defense, testified to virtually the same things and confirmed Dr. Earle's statement that an accidental fall from the bed could have fractured Mrs. Wright's skull.
In addition to medical testimony, evidence was adduced of a violent quarrel between the defendant and the victim. The examining coroner stated that the body of the victim contained fresh bruises on the leg and breast. The most revealing testimony came from the defendant himself. The defendant related that he and his wife had agreed that she would go out in Lafayette and pick up another man. He testified that his wife did in fact return to the motel room with a man and proceeded to have sex with him. Defendant returned to the room to find his wife performing oral sex on the man, a practice which defendant and his wife had apparently agreed to reserve to themselves. Defendant testified to his anger at seeing this, and admitted hitting his wife on the leg, and slapping her. Shortly afterward, as defendant was preparing to leave, the argument resumed, leading to the victim's injury.
Having all this information before it, the jury concluded that every reasonable hypothesis of innocence (accidental injury) was excluded. Evaluation of the totality of the evidence presented convinces us that the jury could have excluded every reasonable hypothesis except murder beyond a reasonable doubt. The nature and severity of the victim's skull fracture (as explained by the coroner and surgeon), the bruises on her body, the fact that defendant and the victim were alone in the room, and defendant's own admission of his outrage at his wife's behavior and of an argument and a beating, when considered as a whole, convinces us that the jury may properly have excluded an accidental fall from a 20" high bed as a reasonable hypothesis.
Likewise, we hold that the jury could have concluded beyond a reasonable doubt that defendant possessed the specific intent to kill his wife. To prove that defendant specifically intended to commit the crime, the State was required to show that defendant actively desired the consequences to follow from his act. La.R.S. 14:10. Clearly, proof of intent must be inferential in this case, since no one was present in the room besides the defendant and the victim. Nevertheless, the jury was presented with a great deal of circumstantial evidence from which intent might be inferred. Specifically, defendants testimony *1203 as to his anger and displeasure with his wife (assuming the truth of her conduct and breach of their agreement) and to the fact that he beat her, coupled with the severity of the skull fracture and the improbability of it being caused by a fall onto a carpeted floor, was clearly sufficient, when viewed in the light most favorable to the prosecution, to have convinced the jury beyond a reasonable doubt that defendant possessed the requisite intent to kill or inflict great bodily harm on his wife.
These assignments of error are without merit.

Assignments of Error Nos. 6 and 7
Defendant did not brief either of these assignments. Under Louisiana jurisprudence, assignments of error not argued or briefed are deemed abandoned. State v. Lindsey, 404 So.2d 466 (La.1981); State v. Sonnier, 379 So.2d 1336 (La.1979), State v. Wientjes, 341 So.2d 390 (La.1976).
These assignments of error therefore lack merit.

Assignment of Error No. 8
Defendant's final assignment of error urges that, because of the long hours of testimony during the two-day trial and the retirement of the jury at 11:00 p.m. until their verdict was returned at 3:00 a.m., he was deprived of his right to a fair trial. In support of this contention, defendant cites U.S. v. Diharce, 526 F.2d 637 (C.A. 5th Cir.1976). In that case, the trial judge ordered trial to begin at 7:30 p.m., when the jury selection had concluded, and concluded the evidentiary portion of the trial by 10:25 p.m. that evening. The 5th Circuit found that in this case, the judge's decision to begin the trial so late in the day was error.
Although we agree with the result reached in Diharce, we do not find that case applicable to the instant facts. The jury in this case was forced to sit through two long days of testimony. However, we find nothing unusual in retiring the jury late in the evening, rather than waiting until the following day. The four hours spent in deliberation reassure us that the jury's verdict was not unduly hurried.
This assignment of error lacks merit.

DECREE
For the foregoing reasons, the conviction and sentence of the defendant are affirmed.
AFFIRMED.