458 So.2d 1357 (1984)
STATE of Louisiana, Appellee,
v.
Patricia Ann ESTER, Appellant.
No. 16429-KA.
Court of Appeal of Louisiana, Second Circuit.
October 31, 1984.
Rehearing Denied November 29, 1984.
*1358 Michael Ingram and Jack Wright, Monroe, for appellant.
J. Carl Parkerson, Dist. Atty., Michael J. Fontenot, Asst. Dist. Atty., Monroe, for appellee.
Before PRICE, JASPER E. JONES and NORRIS, JJ.
NORRIS, Judge.
Patricia Ann Ester was charged by Grand Jury indictment with first degree murder in violation of La.R.S. 14:30. She was found guilty as charged and, in accordance with the jury's recommendation, was sentenced to life imprisonment at hard labor. *1359 Defendant now appeals her conviction and sentence, originally advancing nine assignments of error, abandoning two, and combining the remaining seven into three arguments.

CONTEXT FACTS
On Christmas night of 1981, defendant's husband, Sgt. Major Hubert Ester, a career military man, was killed on a rural road in West Ouachita Parish by Danny Weeks. His body was discovered early the next morning. Death was attributed to loss of blood resulting from a shotgun blast to the victim's arm and chest and a severe beating with the stock or butt of the shotgun to the victim's head. Defendant and Mark Weeks, Danny's younger brother, were at the murder scene when Sgt. Ester was killed. The state's contention, accepted by the jury, is that defendant conspired with Danny Weeks to have him kill her husband for a fee and, as part of the plan she lured him to the murder site where Danny Weeks completed the crime.
The events leading up to this Christmas night murder are painfully complex and we will attempt to summarize the evidence as briefly as possible.
Defendant and Sgt. Ester were married in 1974. They moved to Ouachita Parish, Louisiana, in June of 1981. Their first residence was in West Monroe but several months later defendant moved to the Charmingdale subdivision in Monroe. During this time, defendant actually lived in Ouachita Parish. Sgt. Ester, however, was stationed at Kirkland AFB in Albuquerque, New Mexico and only visited on occasion.
In July of 1981, Patricia Ester met Jackie and Arlene Platt at Lazarre's Point, a recreation area in West Monroe. Jackie Platt testified that on several occasions after that initial meeting defendant expressed dissatisfaction with her marriage and stated she wished her husband were dead or that somebody would kill him. Defendant told Platt she couldn't divorce her husband because that would leave her with nothing, but if Sgt. Ester got killed, she would receive a large amount of insurance money. Patricia Ester also told Platt she knew a man in Lake Charles, Louisiana, who would kill her husband anytime she wanted for a fee of $5000 and would wait to collect his money until she had received the insurance proceeds. On one occasion Jackie Platt also met James Frye, whom defendant stated was her boyfriend. Patricia Ester never asked Platt to kill her husband, but he felt that she was serious when discussing the subject.
Patricia Ester had carried on a long standing affair with James Frye, whom she had known for eight years and who purportedly was Sgt. Ester's best friend. Frye was retired from his position as an instructor in military science at Northeast Louisiana University in Monroe and had been instrumental in getting the Esters to move to the Monroe area.
Nora Perez Weeks was Danny Weeks' common law wife. Nora met Patricia Ester sometime in late October of 1981 after Patricia's move to Charmingdale subdivision. Nora and Danny Weeks were already living in the subdivision with Danny's mother, Margie Weeks. Danny was working offshore. Nora and Danny were in financial difficulty at the time. Nora testified she got to know defendant well and even stayed at her home occasionally. Patricia showed Nora pictures of her husband and family and pictures of her boyfriend, James Frye. Nora met James Frye and had sexual relations with him the night they met. Nora and defendant had conversations about Sgt. Ester. Defendant told Nora it was hard living with Hubert Ester, that she wanted him out of her life, and that although she intended to get out of the marriage she did not want a divorce but had considered hiring somebody to get rid of him. Sgt. Ester was not in Monroe during this period of time.
Danny Weeks came home from working offshore around November 11-12, 1981, while Nora was staying with Patricia Ester. Danny and Nora spent one night at defendant's mobile home then moved to Margie Weeks' house. Danny got fired; Nora and Danny almost split up. About *1360 this time Nora told Danny Weeks what Patricia Ester had said concerning her husband.
Danny and Patricia Ester met the following day. Nora overheard their conversation. Patricia told Danny she wanted Hubert Ester out of her life, that she was willing to pay someone between $5000 and $7000 to get rid of him and she asked Danny if he knew anyone who would undertake the task.
About a day later Patricia and Danny met again at Patricia's mobile home. Patricia asked Danny if he had come up with anyone to get rid of her husband. As a result of this meeting four or five telephone calls were made, in Nora's presence, to the number of one Nicholas Manchaca in Midland, Texas.
Later, Patricia let Danny look through the pictures of Hubert Ester with the intent of giving him one. Several days later, Danny left town for four or five days. When he returned, Patricia and Danny met again at Margie Weeks' residence. Nora heard Patricia ask Danny if he had contacted Sgt. Ester while he was gone to Albuquerque.
Patricia Ester told Danny she was going to borrow money from James Frye to purchase a gun, under the pretext of needing the money for bills. Frye testified that he did in fact loan Patricia Ester $350 on December 8, 1981, and $200 on December 11, 1981, on her representations that the money her husband had sent her to live on had been stolen. Frye further testified Sgt. Ester paid him back the $350 on December 18, 1981, but that the $200 was never repaid.
On December 10, 1981, defendant came to the Weeks' residence and informed Danny and Nora that she had the money to buy the gun. Shortly afterwards, Patricia went in her car, and Danny and Nora in theirs, to the A-1 Pawn Shop where Patricia and Danny went inside and Patricia purchased a pistol. After the purchase, the three left the pawn shop and drove a short way before stopping on the side of the road. Danny walked up to defendant's car and returned moments later with a pistol, bullets and some money.
Lucky N. Reed, the owner of A-1 Pawn Shop, identified state exhibit 23, a standard firearm form showing that Patricia Ester purchased a model .380 101-A Llama pistol on December 10, 1981. Reed could recall neither who might have been with the purchaser nor the purchase price.
On December 11, 1981, Danny and Nora Weeks drove to Albuquerque, New Mexico. They arrived on December 13, 1981, and stayed at the Imperial Motel. While in Albuquerque, they rode out to the base where Hubert Ester was stationed and Danny was armed with a pistol. They returned to Monroe on the 15th or 16th of December. Meanwhile, on December 14, 1981, Sgt. Ester arrived in Monroe where James Frye met him at the airport.
About three or four days after Danny and Nora returned from New Mexico, Patricia came to the Weeks' home and asked for the pistol back.
On Christmas afternoon of 1981, Patricia called the Weeks' home and invited Danny and Nora to come to the Ester home to meet Sgt. Ester. They did not come; shortly afterwards, Patricia Ester came to the Weeks' home and stated she had experienced a rough time with her husband. She asked about the gun again and asked Danny Weeks if he was going through with the murder of Sgt. Ester. Danny stated that he was. Patricia told Danny Weeks she had a plan: Patricia, Nora, James Frye and Sgt. Ester would go to the Ramada Inn for a drink and she would send Hubert Ester to the car to fetch something and Danny could be there waiting for him. Danny replied he did not like that plan and, according to Nora's testimony, he proposed his own plan. He suggested that he should go for a ride, stop and call Nora and have Nora call defendant with the story that his car had broken down; Patricia, in turn, would persuade Sgt. Ester to go out and render assistance to Danny. Patricia Ester agreed to this plan. Nora Weeks testified that after this conversation ended about *1361 4:00 p.m., Patricia Ester left. Nora testified Danny left home that night sometime between 8:00 and 9:00 p.m.
James Frye testified that he went to the Ester home around 6:30 p.m. on Christmas Day and stayed until shortly before 7:00 p.m. While there, Frye testified the telephone rang twice. Patricia answered one time and her son, Scott, answered the other. When Patricia answered the telephone, Frye testified he noticed her scribbling something on paper.
Mark Edwin Weeks is Danny Weeks' younger brother. Mark testified that on December 25, 1981, he had dinner at his sister's house and went home about 5:00 p.m. Later that evening, Danny Weeks asked him if he wanted to go to a party at the Hideaway nite spot in Jonesboro, Louisiana. Mark and Danny left, stopped to purchase some beer and rode around. They stopped again at a bar, where Danny went inside and then came back out. Danny and Mark then drove to a secluded area and stopped on the side of a road where Mark testified a man was later killed. While waiting, Mark testified that Danny Weeks told him that Patricia Ester wanted Danny to kill her husband and that she was going to pay him with insurance money. Mark Weeks stated he and Danny waited for about 30-35 minutes when Hubert Ester's car pulled in front of them. Danny told Mark to get out and open the hood of Danny's car. Hubert and Patricia Ester both got out of the car. Patricia ran past Mark, stating she had to go to the bathroom and stopped behind the Weeks' car. Hubert Ester, according to Mark, said something like, "What's the matter?" Danny Weeks walked past Mark with a shotgun that Mark recognized came from his mother's house. Mark heard a shot and saw Hubert Ester lying in the ditch. Patricia Ester came running up the road. She was scared and Mark held her. Danny came back to the car and stated he couldn't get the shell out of the gun. Mark and Patricia got in the car and sat down. Mark testified Patricia Ester asked Danny Weeks if Hubert Ester was dead and told him to make sure he was dead. Danny Weeks, Mark Weeks and defendant left the scene and proceeded back to Charmingdale subdivision. Danny and Mark dropped Patricia off on the side of the highway, proceeded to Margie Weeks' home, picked up Nora and drove to Jonesboro. Mark testified that on the way to Jonesboro Danny threw a gun and a pistol out of the car. Mark further testified that before arriving in Jonesboro, they stopped on the side of the road where Danny got out and burned a billfold.
Nora Weeks corroborated Mark's testimony about events that occurred after the murder. She testified that around 9:00 or 9:30 p.m. Danny and Mark picked her up to go to Jonesboro. On the way, Nora testified that Danny threw his boots and a shotgun out of the car into the woods. The shotgun was in pieces and was thrown out piece by piece. Danny also threw away the .380 Llama pistol and had Mark put lighter fluid on a wallet with Hubert Ester's I.D. in it and burn it. Hubert Ester's body was found the next morning, along with his vehicle facing north in the south bound lane, the hood released and the keys in the ignition. The engine was off, the windows up, the right door locked and the left door unlocked.
James Frye testified that about 11:00 p.m. on the night of the murder, Patricia Ester telephoned him and told him that Hubert had gone to town to have a couple of drinks and had not returned. Frye told defendant there was nothing to worry about at that point. But, when defendant called again at 4:55 a.m. and told him Sgt. Ester still had not returned, Frye became concerned and stopped by the Ester home on his way to go hunting. On his way in from hunting about 11:30 a.m., Frye again stopped by the Ester home, was told about the police finding a body, and later went to the funeral home and identified Sgt. Ester's body. Frye testified that Patricia Ester never indicated to him that she had been at the scene of the crime and had observed what happened.
*1362 On several occasions after the murder of Sgt. Ester and before February 4, 1982, Nora testified Danny went by to see Patricia Ester. Danny and Patricia communicated on these occasions by passing notes. Danny told Nora that on the first visit Patricia gave him $50. The purpose of these meetings was to see if Patricia Ester had any money to give Danny.
On or about February 4, 1982, Danny, Nora Weeks, Mark Weeks and Patricia Ester were arrested. Nora Weeks and Mark Weeks received leniency from the state in return for their testimony. Nora testified she was arrested for aggravated crime against nature, indecent behavior with a juvenile and accessory after the fact to murder. In return for her testimony at Patricia Ester's trial Nora admitted the district attorney granted her immunity from the accessory after the fact charge. Nora denied the sex related charges were involved in her agreement to testify. However, she did enter into a plea bargain on those charges, pleading guilty to indecent behavior with a juvenile, for which she was sentenced and which sentence she had served by the time she testified at trial.
Mark Weeks testified he had been arrested and his case was pending in juvenile court. The record indicates the state promised him his case would remain in juvenile court and he would not be prosecuted in adult court.
While James Frye waived his fifth amendment rights out of the jury's presence prior to testifying, the record does not reveal the agreement between Frye and the state in return for his testimony at Patricia Ester's trial.
Patricia Ester testified and admitted she and her husband had a troublesome marriage. She admitted her affair with James Frye. She denied telling Jackie Platt she wanted her husband killed and that she knew a hit man in Lake Charles, Louisiana.
Patricia admitted her friendship with Nora Weeks; she knew Nora and James Frye had sexual relations on one occasion, knew Danny Weeks had found out about it, had become angry, and threatened to blackmail Frye about his relationship with Patricia, if Frye didn't pay him $1000. Patricia told Danny to leave Frye out of it and that she would get the money herself.
Patricia claimed she bought the gun for protection and admitted she asked Danny to assist her, even after his blackmail attempt. Her explanation was that Danny knew a lot about guns. She had no explanation why she didn't secure the advice of Frye about purchasing the pistol. Frye testified he was familiar with guns and owned some 15 or 20 of them.
Defendant testified that on the evening of December 25th, she went to Margie Weeks' home and had words with Danny. She told Danny she was going to go home and tell her husband about his demanding money and that she was not going to let Danny blackmail her. Patricia stated that she did tell her husband about Danny's scheme to blackmail Frye for his relationship with Nora, but she never told him about her own relationship with Frye. She testified that Danny Weeks called her home about 6:00 or 6:30 p.m. Christmas night and talked with her husband, setting up a meeting and giving her husband directions to the meeting place which Sgt. Ester mapped out on a piece of paper. According to Patricia, Danny told Hubert that he had something to tell him about Patricia. Defendant stated that she begged her husband not to go meet Danny because she did not want Danny to tell Hubert about her relationship with Jim Frye. Nevertheless, Patricia accompanied her husband to meet Danny Weeks, in spite of her entreaties that he not go. Defendant testified her husband drove, which was unusual since he was not familiar with the Monroe area, and she assisted him by following the map. The map she spoke of was never found, however. She stated they stopped several times along the way when she agreed to tell him what Danny Weeks wanted with him but she could never bring herself to tell him. After they found the road where the meeting was to take place and saw Danny Weeks' parked car, Patricia testified they stopped and she *1363 got out to use the bathroom. As she was coming back she could hear Danny Weeks and her husband having words. She heard the word "blackmail" used, heard the shotgun blast and began screaming. Patricia ran to Mark Weeks and they held each other. Danny Weeks then turned and pointed the gun at them. She heard Sgt. Ester moaning. Danny Weeks threatened to blow off her head if she didn't shut up and told Mark he would leave him in the ditch if Mark didn't shut Patricia up. Patricia stated that before she got back into the car, she told Danny, "He's not dead, God, don't let him die." However, Danny threatened her by telling her to keep her mouth shut or he would kill her and hurt her children.
After she returned home following the murder, Patricia testified she made several phone calls. She called two law enforcement agencies, James Frye and Carol Rainey. She also called both the Ramada Inn and the Holiday Inn. The telephone calls to law enforcement agencies were to inquire whether or not her husband had been picked up for DWI. The calls to the motels were to inquire if her husband had been there. Her calls to Frye and Rainey were to express concern that her husband had gone out and had not returned. Defendant also made inconsistent statements to law enforcement agents about what transpired on the night of Hubert Ester's murder. Finally, on the fourth statement she indicated to the deputies that she had been present and knew who killed her husband. She explained she had lied because she was afraid of Danny Weeks. She admitted she made no effort to make even an anonymous call to secure an ambulance or medical aid for her husband.
The evidence at trial showed that defendant was aware of three different life insurance policies insuring her husband's life, totalling some $90,000. Patricia Ester contacted the Fireside Commercial Life Insurance Company on December 28, 1981, and made a claim on the policy it wrote insuring Hubert Ester's life.
Patricia Ester's trial for first degree murder began August 22, 1983 and ended August 26, 1983. The jury unanimously rejected defendant's version of what happened and returned a verdict of guilty. During the sentencing phase, the jury unanimously recommended the defendant be sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. This sentence was subsequently imposed by the trial court and this appeal followed. Defendant originally asserted nine assignments of error. She has abandoned two and combines the remaining assignments into three arguments.

ARGUMENT NO. 1

(ASSIGNMENTS OF ERROR NOS. 8 & 9)
In this argument, defendant essentially contends (1) that the coconspirator's exception to the hearsay rule embodied in La. R.S. 15:455 violates her federal and state constitutional right to confront and cross examine the witnesses against her; (2) that alternatively, the state failed to properly prove a prima facie case of conspiracy under 15:455 prior to the admission of the coconspirator's declarations; and (3) that the declarations of Danny Weeks' complained of violate the rule of Bruton v. U.S., 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
The hearsay statements at issue are:
(1) Danny Weeks responded affirmatively to an inquiry by Patricia Ester as to whether or not he was going to go through with the murder of Hubert Ester;
(2) Danny Weeks rejected as unacceptable a plan contrived by Patricia Ester whereby Danny would murder Hubert Ester at the Ramada Inn;
(3) Danny Weeks contrived his own plan to lure Sgt. Ester to the isolated rural spot by feigning car trouble and have Patricia and Hubert Ester come to assist him;
(4) Danny Weeks told his brother Mark that Patricia Ester wanted him to kill *1364 Hubert Ester and was going to pay him with insurance proceeds;
(5) Danny Weeks and Patricia Ester passed notes subsequent to the murder by which Danny was requesting money; and
(6) Danny Weeks told Nora Weeks that Patricia Ester gave him $50 subsequent to the date of the murder.
Undoubtedly the statements referred to above were hearsay as they were in court testimony of out of court statements offered to show the truth of the matters asserted therein and resting for their value upon the out-of-court asserter, Danny Weeks. State v. Martin, 356 So.2d 1370 (La.1978). Nevertheless, the trial court allowed the testimony into evidence pursuant to La.R.S. 15:455, the coconspirator exception to the hearsay rule.
According to La.R.S. 15:455:
Each coconspirator is deemed to assent to or to commend whatever is said or done in furtherance of the common enterprise, and it is therefore of no moment that such act was done or such declaration was made out of the presence of the conspirator sought to be bound thereby, or whether the conspirator doing such act or making such declaration be or be not on trial with his codefendant. But to have this effect a prima facie case of conspiracy must have been established.

Issue No. 1
Does the coconspirator's exception to the hearsay rule violate defendant's constitutional right to confront and cross examine the witnesses against her?
Even though a defendant is not charged with the inchoate crime of conspiracy but rather as a principal to a substantive offense, reference to the law of conspiracy is nevertheless relevant and permissible to permit the state to utilize the evidentiary rules found in La.R.S. 15:455. State v. Gutter, 393 So.2d 700 (La.1981).
Prior to this court's decision in State v. Orlando, 456 So.2d 1021 (La.App. 2d Cir. 1984), our Supreme Court had held that the introduction of a coconspirator's hearsay declaration under 15:455 violated neither this state's statute prohibiting hearsay evidence nor the constitutional guarantee of an accused's right to confront and cross examine the witnesses against him, provided certain requisites were fulfilled. State v. Johnson, 438 So.2d 1091 (La.1983); State v. Dupree, 377 So.2d 328 (La.1979). These requisites were set forth in State v. Dupree, supra at 330, as follows:
Before a co-conspirator's declaration may be introduced under this exception, a prima facie case of conspiracy must have been established and it must be shown that the declaration was made in furtherance of the common enterprise and during its continuation [citations omitted] ...
Insofar as we can determine, the issue of the "unavailability" of the hearsay declarant had not been squarely presented to an appellate court of this state in connection with the coconspirator's exception to the hearsay rule prior to Orlando. In Orlando, the state offered the testimony of witnesses to whom Orlando's co-defendant (not jointly tried), Moore, had made statements indicating he was thinking of robbing and killing the victim some two weeks prior to the date of his death. Moore, who had already been convicted and was incarcerated, was not called to testify by the state. Instead, his hearsay statements were offered and admitted under 15:455.
This court, relying on Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), reversed Orlando's conviction concluding that the sixth amendment to the Federal Constitution and Article I, § 16 of the Louisiana Constitution, not only required that a prima facie case of conspiracy be established and that it be shown that the declarations were made in furtherance thereof and during its continuation, but also that the hearsay declarant must have been unavailable to testify.
This issue was also squarely presented to the U.S. Fifth Circuit Court of Appeal in United States v. Peacock, 654 F.2d 339 (U.S. 5 Cir.1981) reh. granted 686 F.2d 356 *1365 (U.S. 5 Cir.1982), vacating unrelated portion; cert. den. ___ U.S. ___, 104 S.Ct. 404, 78 L.Ed.2d 344, wherein the court stated:
Harvey argues that the admission of four declarations by his co-conspirators... violated both his right to confrontation and the rules of hearsay. Count 24 charged Harvey with murdering LeJeune and Brookins to insure their silence in the investigation of this case.
Our inquiry is made considerably easier by Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) in which the Supreme Court resolved the relationship between the rules of hearsay and the Confrontation Clause.
The court held:
In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. [Emphasis supplied.]
Ohio v. Roberts, 100 S.Ct. at 2539.
Here, both prongs of the Supreme Court's test are met in regard to each declaration Harvey challenges. First, the unavailability of the declarants is indisputable; they are dead. Second, we can "infer the reliability" of these declarations because they all "fall within a firmly rooted hearsay exception." 654 F.2d at 349.
The court in Peacock went on to point out that the coconspirator's declaration is a firmly rooted hearsay exception. See also, State v. Johnson, supra; State v. Gutter, supra; State v. Kaufman, 331 So.2d 16 (La.1976); State v. Carter, 326 So.2d 848 (La.1975); State v. Hodgeson, 305 So.2d 421 (La.1975); State v. Michelli, 301 So.2d 577 (La.1974); State v. Hogan, 3 La.Ann. 714 (La.1848); State v. Orlando, supra. Comment, The Co-Conspirator Exception to the Hearsay RuleThe Limits of Its Logic, 37 La.L.Rev. 1101 (1977).
We conclude, based on the foregoing authorities, that admission into evidence of a coconspirator's hearsay declarations under 15:455 does not violate a defendant's right of confrontation and cross-examination under the Sixth Amendment to the United States Constitution or Article I, § 16 of the Louisiana Constitution provided:
(a) the unavailability of the declarant is established or undisputed; and
(b) a prima facie case of conspiracy has been established and it has been shown that the declarations were made in furtherance of the common enterprise and during its continuation.
Defendant's constitutional assault on R.S. 15:455 is without merit.

Issue No. 2
Here, defendant contends the state failed to establish a prima facie case of conspiracy prior to the introduction of the contested statements or declarations.
In order to determine whether a prima facie case of conspiracy has been established, we must first define the crime of conspiracy. La.R.S. 14:26 defines criminal conspiracy as the agreement or combination of two or more persons for the specific purpose of committing any crime, provided however, that such an agreement or combination shall not amount to a conspiracy unless, in addition to such combination or agreement, one or more of the parties does an act in furtherance of the agreement or combination.
For purposes of this case, first degree murder is defined in La.R.S. 14:30(4) in pertinent part as follows:
First degree murder is the killing of a human being:
* * * * * *
(4) When the offender has specific intent to kill or inflict great bodily harm and has offered, has been offered, has given, or has received anything of value for the killing.
Proof of a conspiracy may be made by direct or circumstantial evidence. State *1366 v. Brown, 398 So.2d 1381 (La.1981); State v. Clark, 387 So.2d 1124 (La.1980), reh. den. 450 U.S. 989, 101 S.Ct. 1530, 67 L.Ed.2d 825 (1980).
Our Supreme Court has held that a prima facie case of conspiracy is presented when the state introduces evidence which, if unrebutted, would be sufficient to establish the fact of conspiracy. State v. Johnson, supra; State v. Brown, supra; State v. Dupree, supra. However, under 15:455, the state cannot rely on the coconspirator's declaration itself to supply the prima facie case of conspiracy. The conspiracy must be established by separate admissible evidence. State v. Meredith, 403 So.2d 712 (La.1981); State v. Millet, 356 So.2d 1380 (La.1978). The utterances of the defendant can be used to prove a prima facie case of conspiracy. State v. Rittiner, 341 So.2d 307 (La.1976).
In the instant case, considering only the evidence presented by the state, we find that there was a prima facie showing of conspiracy prior to the admission of any of the above complained of declarations by Danny Weeks. The record reveals that before the state attempted to offer the disputed declarations, the following separate admissible evidence had been presented to establish that there was an agreement between Patricia Ester and Danny Weeks for the specific purpose of killing Hubert Ester, that Patricia Ester offered Danny Weeks money for carrying out the plan, and that there were acts in furtherance of the agreement done by both parties.
The defendant had told Jackie Platt that she wished someone would kill her husband; that she knew a man in Lake Charles, Louisiana, who would kill him anytime for a fee of $5000 and who would wait to collect his fee until she received the insurance proceeds.
The defendant was having an affair with James Frye.
Defendant told Nora Weeks that she intended to get out of her marriage but did not want a divorce and had considered having someone to get rid of her husband.
Defendant told Danny Weeks she wanted her husband out of her life, that she was willing to pay between $5000 and $7000 to get rid of him, and asked Danny if he knew anyone who would undertake the job. She subsequently asked Danny if he had come up with someone to do the job and, as a result of this conversation, telephone calls were made to Midland, Texas purportedly to contact one Nicholas Manchaca.
Defendant let Danny Weeks look at pictures of Hubert Ester with the intent of giving him one. Several days afterwards Danny Weeks left town, was gone for four or five days and when he returned defendant asked him if he had contacted her husband while he was in Albuquerque, New Mexico.
Defendant, with Danny Weeks' assistance, bought a pistol from A-1 Pawn Shop after borrowing money from James Frye under the pretext that the money was to be used to pay bills. After the gun was purchased, defendant gave the gun, bullets and some money to Danny Weeks. Thereafter, Danny, armed with the pistol, and Nora Weeks went to Albuquerque, New Mexico, where Sgt. Ester was stationed and rode out to the Air Force Base and looked around. Meanwhile, Sgt. Ester had come to Monroe to be with his family.
Corroboration of the purchase of the pistol was introduced through the testimony of Mr. Reed, owner of A-1 Pawn Shop, who identified a firearms purchase form dated December 10, 1981 whereby Patricia Ester purchased a .380 Llama pistol.
Hubert Ester was killed by Danny Weeks on the night of December 25, 1981. Defendant and Mark Weeks were present at the murder scene and defendant rode to the scene of the murder with the victim. After Danny Weeks shot Hubert Ester defendant told Danny Weeks to make sure he was dead.
Furthermore, we observe that after the trial court ruled the prima facie case of conspiracy had been made, based only on *1367 the evidence described above, and prior to the admission of any of the disputed declarations of Danny Weeks, the state proceeded to introduce additional, independently admissible evidence which strengthened the prima facie case already made. This evidence consists of Nora Weeks' testimony that on the afternoon of December 25, 1981, defendant came to the Weeks' home with bruises on her face, complaining she had had a rough time with her husband, and asking Danny about the gun and whether he was going through with the murder of Hubert Ester.
We are convinced that the above facts, circumstances and the permissible inferences which can be drawn therefrom, left unexplained, are sufficient to establish an agreement between defendant and Danny Weeks for the specific purpose of committing the crime of first degree murder, i.e., the killing of Hubert Ester with the offenders' specific intent to kill and with Patricia Ester offering Danny Weeks money for the killing. The state made a prima facie showing that defendant and Danny Weeks by their words and actions, agreed and combined to kill Hubert Ester. Compare, State v. Johnson, supra.
Further, consistent with the requirement of 15:455, it is clear that Danny Weeks' declarations were made in furtherance of the common enterprise and during its continuation. The declarations at issue were all made either during the planning stage of the murder, during the murder itself, or shortly thereafter when Danny Weeks attempted to collect his fee.
We conclude that the statutory requisites for the introduction of the hearsay declarations under the coconspirator hearsay exception have been met. A prima facie case of conspiracy was established by the state and it was shown that the declarations were made in furtherance of the common enterprise and during its continuation. Defendant's contention to the contrary lacks merit.
Furthermore, the record clearly reflects that the unavailability of Danny Weeks for trial was established and undisputed. Defendant stipulated that the state subpoenaed Danny Weeks and that he did not appear to testify. The reason he failed to appear was also established and undisputed. Danny Weeks had escaped from the Ouachita Parish Jail where he was incarcerated and was on escape status at the time of trial. Defendant's bare contention that his escape was attributable to the negligence of the state for allowing him to escape in broad daylight has absolutely no foundation in the record and is meritless.
We hold that in this case the unavailability of the declarant of the contested statements is undisputed; a prima facie case of conspiracy was established prior to the admission of the contested coconspirator declarations; and that it was shown that the declarations were made in the furtherance of the common enterprise and during its continuation. Therefore, the necessary requisites were met and defendant's right of confrontation and cross-examination under the United States and Louisiana Constitutions was not violated. The lower court properly admitted the coconspirator declarations of Danny Weeks pursuant to La. R.S. 15:455.

Issue No. 3
Finally, under this argument, defendant attempts to equate the admission of Danny Weeks' statements to the admission of an out-of-court confession by a non-testifying co-defendant being jointly tried, thus violating her right of confrontation under Bruton v. U.S., 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
We conclude Bruton is not applicable here. As stated in State v. Nix, 327 So.2d 301, 328 (La.1975):
Later cases decided by the United States Supreme Court and the federal courts of appeals have carved out a clear exception to the Bruton rule in cases involving a recognized exception to the hearsay exclusionary rule. In such case, the defendant's right to confrontation is not violated.
Moreover, Bruton is distinguishable on its facts. At issue in Bruton was the *1368 admissibility of a confession elicited during custodial interrogation by police officers which implicated the jointly tried co-defendant.
In the instant case there is no confession resulting from custodial interrogation by police officers. The defendant and Danny Weeks were not jointly tried and the coconspirator exception to the hearsay rule is a recognized hearsay exception. The statements of Danny Weeks bear further "indicia of reliability" because they are statements against his penal interest.
Defendant's Bruton argument lacks merit.
For the reasons set forth above, this argument pertaining to assignments of error nos. 8 and 9 lacks merit.

ARGUMENT NO. 2

(ASSIGNMENTS OF ERROR NOS. 5, 6, & 7)
In this argument defendant contends that her conviction was based on insufficient evidence. She asserts that the verdict of the jury was contrary to the law and the evidence (number 5); that the state failed to prove beyond a reasonable doubt all the essential elements of the crime charged (number 6); and that the trial court erred in denying defendant's motion for post-verdict judgment of acquittal (number 7).
Following her conviction, defendant moved for a post-verdict judgment of acquittal pursuant to LSA-C.Cr.P. Art. 821. She contended that the evidence against her was largely circumstantial, did not exclude every reasonable hypothesis of innocence as required by La.R.S. 15:438, and did not reasonably permit a finding of guilty when viewed in the light most favorable to the prosecution. This motion was heard and denied.
La.R.S. 14:30(4) provides:
First degree murder is the killing of a human being:
* * * * * *
(4) When the offender has specific intent to kill or inflict great bodily harm and has offered, has been offered, has given, or has received anything of value for the killing.
La.R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
The court in State v. Nealy, 450 So.2d 634 (La.1984) enunciated the applicable standard in this state for reviewing sufficiency of evidence to support a conviction:
The constitutional standard of review for the sufficiency of evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The statutory rule as to circumstantial evidence is that assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. La.R.S. 15:438. This statutory rule is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of the evidence test whenever the state relies on circumstantial evidence to prove an element of the crime. State v. Wright, 445 So.2d 1198 (La.1984). Ultimately, the Jackson standard is the objective standard for testing the overall evidence, direct and circumstantial, for reasonable doubt. State v. Wright, supra; State v. Sutton, 436 So.2d 471 (La.1983). The statutory rule provides an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found the defendant guilty beyond a reasonable doubt. Exclusion of every reasonable hypothesis of *1369 innocence is therefore a component of the more comprehensive reasonable doubt standard, where circumstantial evidence is used to convict. Thus, although the circumstantial evidence rule (La.R.S. 15:438) may not establish a stricter standard of review than the more general reasonable juror's reasonable doubt formula, it emphasizes the need for careful observance of the usual standard and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence. State v. Wright, supra; State v. Sutton, supra; State v. Chism, 436 So.2d 464 (La.1983). 450 So.2d at 636-637.
The essential facts of this case have already been discussed at length and need not be repeated here. It is clear to us that viewing all the evidence, both direct and circumstantial, in light of the applicable constitutional standard, a rational trier of fact could have found beyond a reasonable doubt that defendant was a principal in committing the crime of first degree murder. The jurors obviously (and reasonably) came to the conclusion that defendant's version of the events leading up to, during, and after the murder of her husband was a fabrication designed to deflect blame from her. Her version of the saga of events was certainly discredited by her actions following the murder. Upon returning home after the murder, defendant called law enforcement agencies under the guise of ascertaining if her husband had been picked up for DWI and called the Holiday Inn and Ramada Inn to see if he was there. She also called James Frye and Carol Rainey to feign alarm that he had gone out drinking and not returned and she made no effort even to anonymously secure an ambulance or medical aid, even though she had last seen Sgt. Ester lying wounded and moaning in the ditch beside a rural road many miles from her home. Additionally, defendant admitted making more than one false statement to law enforcement officials before finally admitting that she was present at the murder site and knew who killed her husband. Under these circumstances, the jurors' conclusion that defendant was not testifying truthfully could reasonably support an inference that the truth would have been unfavorable to her defense that she was an innocent and unwilling participant in the crime. In short, the jury could have reasonably concluded that defendant concocted her version of the crime to hide her own guilt. Compare State v. Rault, 445 So.2d 1203 (La.1984).
As stated in State v. Captville, 448 So.2d 676, 680 (La.1984):
When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. An evaluation of the reasonableness of other hypotheses of innocence provides a helpful methodology for determining the existence of a reasonable doubt. As we have recognized in such cases as State v. Wright, 445 So.2d 1198 (La.1983), State v. Graham, 422 So.2d 123 (La.1982), and State v. Sutton, 436 So.2d 471 (La.1983), the court does not determine whether another possible hypothesis has been suggested by defendant which could explain the events in an exculpatory fashion. Rather, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the alternative hypothesis is sufficiently reasonable that a rational juror could not "have found proof of guilt beyond a reasonable doubt". Jackson v. Virginia, above.
In sum, we conclude that the jury's verdict reflected a reasonable construction of the events surrounding the murder of Sgt. Ester based upon the totality of the evidence viewed in the light most favorable to the prosecution. The jury reasonably rejected defendant's version of the crime and there does not appear to be any other hypothesis which raises a reasonable doubt as to defendant's guilt. Thus, we cannot say that a rational juror could not have voted to convict.
This argument is without merit.

*1370 ARGUMENT NO. 3

(ASSIGNMENTS OF ERROR NOS. 3 & 4)
Prior to trial on the instant charge, defendant was tried in the same court in docket number 40547 on a twelve count indictment charging six counts of indecent behavior with a juvenile and six counts of incest. She was convicted of four counts of indecent behavior with a juvenile and sentenced to sixteen years at hard labor. At time of trial in the instant matter, that conviction was on appeal. On June 13, 1983, this court remanded that matter to the district court for proceedings on a motion for new trial.
Because the state chose to try and convict the defendant on the sex charges before proceeding with the instant matter, defendant argues that the state was guilty of prosecutorial abuse resulting in the denial of her right to due process of law and a fair and impartial trial. The argument advanced by defendant, without citation of authority, is that her right to testify in her own behalf guaranteed under La.Const. of 1974, Art. I, § 16, was prejudicially impaired. Defendant did testify in her own behalf but the convictions were used for impeachment purposes. See State v. Rhodes, 351 So.2d 103 (La.1977).
Defendant raised this multiple prosecution issue previously in this court on her application for writs of certiorari, prohibition, mandamus and for a stay order in No. 15,220-KW. We denied defendant's application stating:
WRIT DENIED.
The district attorney has the right to select the sequence in which to try the offenses on which the defendant has been indicted. C.Cr.P. Art. 61.
We find no reason to question our earlier disposition.
The Louisiana Constitution of 1974, Art. 5, § 26(B) states that the district attorney "shall have charge of every criminal prosecution by the state in his district."
La.C.Cr.P. Art. 61 provides that the district attorney "has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when and how he shall prosecute." (Emphasis supplied.)
In State Ex Rel. Eames v. Amiss, 288 So.2d 316 (La.1974) the court stated:
... [W]e do not attempt to dictate to the District Attorney the order of prosecution of multiple charges pending against an accused ... as long as a District Attorney's exercise of the authority granted him under C.Cr.P. Article 61 to determine the order in which multiple prosecutions against a defendant are to be brought, does not operate to supercede the federal and state constitutional guarantees of a speedy trial, it cannot, and will not, be disturbed by the judicial branch of government. 288 So.2d at 318.
This argument lacks merit.
For the foregoing reasons, defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.