761 So.2d 586 (2000)
STATE of Louisiana
v.
Michael DUNCAN.
No. 99-KA-0778.
Court of Appeal of Louisiana, Fourth Circuit.
April 19, 2000.
*587 Sherry Watters, Louisiana Appellate Project, New Orleans, LA, Counsel for Defendant/Appellant.
Harry F. Connick, District Attorney, Charles E.F. Heuer, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff/Appellee.
(Court composed of Chief Judge ROBERT J. KLEES, Judge WILLIAM H. BYRNES, III, Judge MICHAEL E. KIRBY).
KIRBY, Judge.

STATEMENT OF CASE
On January 8, 1998, the defendant, Michael Duncan, was indicted for the second degree murder of Lucille Diane Heim. The defendant entered a plea of not guilty at his arraignment on January 13, 1998. On the same date, the defendant filed discovery and suppression motions. A motion hearing was held on March 20, 1998. The trial court found probable cause and denied defendant's motion to suppress identification. After a jury trial on September 8, 1998, the defendant was found guilty as charged. A sentencing hearing was held on September 14, 1998. The trial court denied defendant's motion for new trial and motion for post verdict judgment of acquittal. The trial court then sentenced defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The trial court granted defendant's motion for appeal and set a return date of November 16, 1998.

STATEMENT OF FACT
Dessiere Ford and the victim, Lucille "Diane" Heim, worked together at Paul Piazza & Sons. On November 24, 1997, Diane arrived at work at approximately 7:00 a.m. Dessiere testified that Diane was acting strange that day. At one time during the day, Diane pulled Dessiere into the bathroom and showed Dessiere marks that she had on her neck. Dessiere and Diane left work together around 2:00 p.m. *588 Diane's son, Dale Herring, met them. Dale was Dessiere's boyfriend. The three of them walked to Diane's house on St. Ann Street. When they arrived home, they watched television in the living room. Shortly after they arrived home, the defendant, Michael Duncan, arrived home. The defendant was Diane's boyfriend. The defendant, Diane, Dale and Diane's daughter, Danielle, lived together at the St. Ann residence. The defendant left for a short time and then returned. When the defendant returned, he paced back and forth from the rear of the house to the front of the house. Dessiere and Dale left the house around 4:00 p.m. and went to Dessiere's mother's house. Dale stayed at her house for at least one hour and then went home. Dessiere testified that she did not see a light green Ford Expedition parked around Diane's house. She further stated that none of Dale's friends were thirty-four to thirty-five years old, had scars on their face and drove a light green Ford Expedition.
Dr. Paul McGarry, a forensic pathologist with the Orleans Parish Coroner's office, performed an autopsy on the victim, Lucille Diane Heim. Dr. McGarry testified that the victim suffered blunt, heavy injuries to the face. Her left forehead had been driven inward breaking the bone and driving the bone inward to her brain. In addition, her nose and cheeks were broken, teeth were broken off, and her lips were torn and lacerated. She also sustained injuries to her neck. The victim's body was extensively burned. Dr. McGarry testified that a blunt object, such a baseball bat, could have caused the victim's injuries. The injuries indicated that the victim was struck several times over different areas. The witness opined that the victim could have survived these injuries if she had received proper treatment. The victim also sustained injuries to the neck area. The victim suffered fractures of the hyoid bone and voice box. These injuries are typical of manual strangulation. Dr. McGarry further stated that the victim was dead at the time of the fire. There was no evidence that she breathed any flames or smoke into her throat or lungs. The victim's body was charred and black. The skin was burned away, exposing the tissues and muscles under her skin. The bones of her legs were exposed and burnt. There was bruising of the brain over both frontal lobes. The coverings of the brain were torn open. Dr. McGarry testified that the cause of death was the breaking of the bones at the base of her skull that caused bleeding into her sinuses. Dr. McGarry stated that had the victim received proper treatment, she would have survived. He acknowledged that she would have had permanent brain damage.
Dale Herring, the victim's son, testified that he met his mother and his girlfriend at approximately 2:00 p.m. on November 24, 1997. He walked home with them. The defendant was not at home when they arrived, but came home a short time later. While the defendant was home, he paced up and down the length of the house. Dale and his girlfriend, Dessiere, left the house at approximately 4:00 p.m. and went to Dessiere's mother's house. Dale returned home at approximately 7:00 p.m. When he arrived home, fire trucks were at the house. Dale stated that he did not see the defendant around the house when he got home. Dale's sister, Danielle, was at their uncle's house around the corner. The witness acknowledged prior convictions for possession of cocaine and possession of marijuana in 1996, and resisting arrest in 1997. The witness further stated that none of his friends had scars on their faces and/or drove a green Ford Expedition.
Leonard Santee, Jr. lived at 2822 St. Ann Street in November of 1997. He lived next door to the victim and the defendant. Mr. Santee testified that he was at home on the evening of November 24, 1997. At approximately 5:00 p.m., he heard several thumping sounds. The noises sounded like someone was knocking on the wall or putting pictures on a wall. Shortly thereafter, *589 he left his house to go to the corner grocery store. When he came back, approximately five minutes later, everything was quiet. About fifteen minutes later, someone knocked on his door and told him that the house was on fire. Mr. Santee stated that he did not see a green Ford Expedition in front of his house that evening. The witness had not seen the defendant and/or the victim that day.
Charles Henderson, Jr. lived at 2830 St. Ann Street in November of 1997. His residence was three houses down from the defendant's and victim's house. The defendant had worked for the witness for a short time. Mr. Henderson testified that he was at home on the evening of November 24, 1997. He was inside his house when he heard someone yell "fire." Mr. Henderson stated that he went to his door and looked outside. He saw the house on fire. Mr. Henderson told his wife to call 911. The witness then went to the burning house. He knocked down the front door and crawled into the house. The door was locked and difficult to break down. It felt as if there was something behind the door. The house was full of smoke when Mr. Henderson was finally able to enter it. He crawled to the first bedroom to see if the children were in the beds. He attempted to go further towards the back of the house but had to turn around because the heat became too intense. A neighbor grabbed him as he exited the house. Mr. Henderson testified that he did not see a gun or anything on the floor when he was in the house. The witness stated that he had seen the defendant and Dale entering the house earlier that day. Later, he saw Dale and his girlfriend leaving the house. The witness stated that he was outside when Dale and Dessiere left. He spoke with them briefly and went inside about ten minutes later. He did not see the defendant leave the house during that period of time. Shortly thereafter, about ten minutes later, he heard a neighbor yell "fire." Mr. Henderson further testified that he never saw a green Ford Expedition around the neighborhood and/or a man with a scar entering the victim's house.
Officer Thomas St. Germain of the New Orleans Fire Department's Arson Squad investigated the fire at 2820 St. Ann Street. Officer St. Germain testified that the fire department received a call about the fire at 6:41 p.m. When Officer St. Germain arrived on the scene, the victim's body had not yet been moved. He took photographs of the body and house. The victim was found next to the bed on the floor. The victim was lying on her back with her left leg under the bed. The fire heavily consumed the dresser, bed, and mattress. Only the bed springs were left. An electrical shortage was eliminated as a cause of the fire. It was determined that the fire began in the back bedroom, possibly on the mattress. The heaviest fire burns were found on the mattress. The cause of the fire was never determined. Cigarette butts were found throughout the house. The scene suggested that a struggle took place prior to the fire. A sofa had been moved and a plant was knocked off of the coffee table. Officer St. Germain testified that, in his expert opinion, arson was the cause of the fire. No accelerants were found on the scene. Officer St. Germain stated that the fire had probably been burning for fifteen to twenty minutes before the fire department arrived.
Vivian Duncan, the defendant's sister, testified that her brother arrived at her house between 6:45 p.m. and 7:00 p.m. on the evening of November 24, 1997. The defendant was wearing a white tee shirt, blue jeans and white tennis shoes. The defendant had blood stains on his jeans. Vivian asked the defendant about Diane. The defendant told Vivian that Diane was at home. Vivian's daughter saw the blood stains on defendant's jeans and asked the defendant about them. The defendant told them that he and Diane got into an argument and she hit him on the hand. The defendant said that there was an unknown man in the house with Diane when *590 he got home. Diane asked the defendant to leave. The man put a gun to his face and asked the defendant if he wanted to leave like a man or leap like a frog. The defendant said that the man drove a green Ford Expedition. The defendant did not say anything about hitting the victim with a baseball bat or strangling the victim. The defendant did not ask the witness to call 911. Vivian lived approximately one mile from the defendant. It would take approximately thirty minutes to get to her house from the defendant's house by bicycle. The defendant did not say that Diane was hurt or that he left her with a man whom had a gun. The defendant did not say anything about a fire. The defendant asked the witness how he could get bloodstains out of his pants.
Rose Duncan, defendant's younger sister, testified that she saw the defendant in front of Vivian's house on the evening of November 24, 1997. She was leaving Vivian's house between 6:30 p.m. and 7:00 p.m. when she saw the defendant arrive at the house on a bike. The defendant appeared sweaty and nervous. One of his hands was cut and swollen. The defendant told the witness that he hit a guy who had entered his house. The defendant said that the man entered the house and put a gun to his head. The defendant then struck the man with his hand. The defendant stated that the man was looking for money that Dale owed him. The witness did not believe the defendant's story. She stated that the defendant was nervous and could not get his story straight. She spoke with the defendant for five minutes outside her sister's house and then left.
Danielle Herring, the victim's daughter, testified that she last saw her mother at approximately 2:30 p.m. on November 24, 1997. She spent the afternoon and evening at her uncle's house on Dumaine Street. At approximately 6:00 p.m., she passed in front of her house and observed that the lights were on in the front room. It was unusual as they did not spend much time in that room. She did not see a green Ford Expedition in the area. Danielle testified that none of her brother's friends was approximately thirty-five years old, had a facial scar, and drove a green Expedition.
John Heim, Jr., the victim's brother, was on the scene when the fire trucks arrived. Mr. Heim testified that he attempted to contact the defendant on the morning after the fire. The defendant heard that Heim was attempting to contact him, and defendant called Heim. The defendant denied any involvement in the victim's death and the fire. The witness did not believe the defendant and told the defendant that he should turn himself in.
New Orleans Police Detective Terry Phillips investigated the victim's death. When he arrived on the scene, fire trucks were parked in the middle of the street. The firemen were still in the house. The police officers waited for the firemen to clear the premises before they investigated the scene. Det. Phillips testified that the house was full of smoke and that there was a great deal of water damage. The fire was concentrated in the rear of the house. The rear bedroom was consumed by the fire. The walls and most of the furniture were burnt. Only the bed springs were left on the bed. The officers found a knife and smoke detector on the sofa in the front room. There appeared to be blood on the tip of the knife. The furniture was out of place in the front room but there was no damage from the fire. Detective Phillips stated that he interviewed witnesses and recovered the defendant's clothing. The officer also collected some tools which family members found inside the residence. The tools were found underneath the burnt bed. The officer did not find a baseball bat. The bat was supposedly in the rear bedroom. Since the bat was wooden, the officer opined that it probably burned in the fire. The defendant's tee shirt and pants tested positive for human blood. However, there was insufficient amount of blood to type it. *591 Detective Phillips arrested the defendant and took a statement from him.
Officer Keith Barker, a criminalist with the New Orleans Police Department Crime Lab and an expert in serology, examined the defendant's clothes and other evidence for the presence of human blood. Officer Barker testified that the knife found on the sofa tested positive for the presence of human blood. However, he was unable to type the blood. Human blood was also found on the defendant's tee shirt, blue jeans and Nike tennis shoes. The blood found on the clothing and shoes was unable to be typed.
Sgt. Cynthia Patterson assisted in the homicide investigation. When she arrived on the scene, there were fire and police units on the scene. She received a call about the fire at approximately 6:41 p.m. when the police and fire departments were contacted. The fire department arrived at approximately 6:45 p.m. The officer spoke with the defendant the next day. The defendant was given his rights and signed a waiver of rights form. The defendant then gave the officer a statement. The defendant told the officer that he was leaving his house when an unknown man approached him, raised his shirt and showed the defendant a gun. The man forced the defendant back into the house. The defendant told Sgt. Patterson that he got into a fight with the victim and the unknown man in the house. During the course of the fight, the defendant struck the victim with a baseball bat several times in the head and once in the leg. The defendant stated that the victim was trying to stop the fight. He did not intentionally hit the victim. He had swung the bat and accidentally hit her. The defendant stated that the unknown man drove a green Ford Expedition which was parked in front of defendant's neighbor's house. Sgt. Patterson interviewed several of the defendant's neighbors. None of the neighbors' statements corroborated the defendant's story about a green Ford Expedition. The defendant further stated that he arrived at his sister's house at approximately 7:00 p.m. It took him approximately thirty-five minutes to ride his bike from his house to his sister's house. He left his house between 6:20 p.m. and 6:30 p.m. The defendant gave Sgt. Patterson the alleged license plate number of the Ford Expedition. After researching the license plate number, the officer learned that the State of Louisiana had not yet issued the license plate number.
Michael Duncan testified on his own behalf. He stated that he and the victim had lived together since 1993. He denied killing the victim and setting the fire. Duncan testified that on November 24, 1997, Diane, Dale and Dessiere arrived home at approximately 2:00 p.m. He was not home at the time they arrived, but arrived approximately fifteen minutes later. Diane, Dale and Dessiere were drinking and talking. The defendant stated that he went to the back bedroom and watched television. A short time later, Diane, Dale and Dessiere left. About twenty minutes later, Diane returned. She said that she walked Dale and Dessiere to the bus stop. The defendant and Diane talked for awhile. He told her that he was going to go for a bike ride. When the defendant returned, Diane was not at home. Diane came home a short time later. They talked for awhile, and then the defendant told Diane that he was going to ride his bike to Vivian's house. As the defendant was leaving, a man came to the front door of the house and shoved the defendant into the front room. The man wanted to know if Dale was at home. Diane asked the man what he wanted with Dale. The man said that Dale had some stuff for him. The man stated that if he did not get his stuff, someone was going to get hurt. The defendant stated that he had never seen the guy before but later learned his name was Sidney Williams. Diane asked the man not to hurt Dale. As the defendant attempted to leave, the man attacked him. The man pushed the defendant against the sofa. They struggled for several minutes. *592 Diane broke up the fight and told the defendant not to get involved. She would take care of the matter. The defendant told Diane that he was going to his sister's house. During the fight, the man picked up a baseball bat and swung it at the defendant, striking the defendant's hand. The defendant was able to take the bat from the man. The defendant hit the man on the left shoulder. Diane was on the love seat, trying to stay out of the way. The defendant then hit the man on the arm and across the chin. The man fell to the ground. Diane told the defendant to leave. The defendant then left. The defendant admitted that he accidentally hit Diane with the baseball bat. The defendant stated that he was swinging at the man while Diane was trying to stop the fight. She got in the way and he hit her on the arm and on the side of her jaw. The defendant stated that it appeared that the man had a gun. The defendant left his house at approximately 5:50 p.m. He was wearing a blue windbreaker, a tee shirt, blue jeans and white Nike tennis shoes. The defendant's hand was swollen. The defendant further testified that the man, Sidney Williams, drove a light green Ford Expedition. Williams parked the vehicle between the alleyway and the defendant's house. The defendant stated that it took him thirty-five to forty minutes to get to his sister's house. When he arrived at Vivian's house, he saw his sister Rose leaving. He told Rose about the incident. After Rose left, the defendant went inside Vivian's house and told Vivian about the incident. The defendant played with his nieces and nephews for a while and then fell asleep. He spent the night at his sister's house. The defendant contended that the bloodstains on his jeans came from the injury on his hand. No one mentioned the blood stains to him. The next morning, the defendant called his neighbor, "Momma Lou," to get in touch with Diane as he and Diane did not have a telephone. "Momma Lou" told the defendant about Diane's death and the fire. Later, "Momma Lou" called him back and told him that Diane's brother, John, wanted to talk to him. The defendant called John and told him what happened at the house. John told the defendant that Diane was dead and he believed that the defendant killed her. The defendant told John that he did not kill Diane. John also told the defendant that he should turn himself in. The defendant called an attorney and then called the police.

ERRORS PATENT
A review of the record for errors patent reveals that the trial court sentenced the defendant immediately after denying defendant's motion for new trial and motion for post verdict judgment of acquittal. There is no indication in the record that the defendant waived his rights to all legal delays prior to sentencing. Under La.C.Cr.P. art. 873, the defendant is entitled to a twenty-four hour delay between the rulings on his post trial motions and sentencing. In State v. Augustine, 555 So.2d 1331 (La.1990), the Louisiana Supreme Court held that failure to waive the twenty-four hour delay voided the defendant's sentence if the defendant attacks his sentence, even though the defendant fails to specifically allege this failure as an error on appeal. However, the Fourth Circuit, in State v. Collins, 584 So.2d 356 (La.App. 4th Cir.1991), held that the failure to observe the delay would be deemed harmless error where the defendant did not challenge his sentence on appeal. As the defendant has not challenged his sentence on appeal, this error is harmless.

DISCUSSION

ASSIGNMENT OF ERROR NUMBER 1
In his first assignment, the defendant contends that the trial court erred when it allowed the State to introduce a baseball bat into evidence as demonstrative evidence. A review of the trial transcript reveals that the trial court did not allow the State to introduce the bat into evidence. The trial court allowed the *593 State to use the baseball bat as a demonstrative aid during its closing argument.
In his brief, the defendant relies upon several cases that discuss the admissibility of demonstrative evidence. This court discussed the admissibility of demonstrative evidence in State v. Richardson, 96-2598, pp. 4-5 (La.App. 4th Cir. 12/17/97), 703 So.2d 1371, 1373, writ denied, State ex rel. Richardson, 98-0228 (La.9/25/98), 726 So.2d 7:
To be admissible, demonstrative evidence must be identified and authenticated. La. C.E. art. 901. As a foundation for admitting demonstrative evidence, it must be established that the object sought to be introduced is more probably than not connected with the case. State v. Tatum, 506 So.2d 584 (La.App. 4th Cir.1987); State v. Matthews, 95-1245 (La.App. 4th Cir. 8/21/96) 679 So.2d 977, 984, writ denied, 96-2332 (La.1/31/97), 687 So.2d 403. A lack of positive identification of demonstrative evidence or its chain of custody goes to the weight of the evidence, not to its admissibility, and the connection of that evidence to the case is a factual matter to be determined by the trier of fact. State v. Lewis, 452 So.2d 720 (La.App. 4th Cir.1984).
In State v. Manieri, 378 So.2d 931 (La.19[79]), our Supreme Court held that it was error to allow the introduction of a weapon which was "similar" to the weapon used during the commission of the charged crime. It reasoned that "the jurors naturally tend to infer a connection between the weapon and the [crime] simply from a mere viewing of the material object, although such a connection is not proved." Id. at 933. In that case, the State introduced knives similar to the knife used to kill the victim. However, the court found that the erroneous introduction of the knives did not prejudice the defendant because there was no attempt to associate the knives introduced by the State with the knife used by the defendant. In State v. Villavicencio, 528 So.2d 215 (La.App. 4th Cir.1988), writ denied, 533 So.2d 14 (La.1988), the defendant argued that the court committed reversible error when it allowed the State to introduce a rifle into evidence that was indisputably not used in the commission of the crime for which the defendant stood trial. We found it error to admit the rifle into evidence because it was irrelevant to the case and a jury could improperly infer a connection between the rifle and the crime. Id. at 217. However, we held that the error did not constitute reversible error because there was no attempt by the State to link the rifle with crime and because there was ample evidence to convict the defendant of the murder without the introduction of the rifle. Likewise, in State v. Everridge, 523 So.2d 879 (La.App. 4th Cir.1988), the defendant claimed that the trial judge erred in allowing a gun into evidence that had not been used in the crime. Again, we found that introduction of the gun constituted error, but that such error was not reversible error. In that case, there also was no attempt by the State to link the gun with the crime and, furthermore, the State did not seek to exploit the admission of the gun.
In the present case, the trial court did not allow the State to introduce the baseball bat into evidence. The State was allowed to use the bat as a demonstrative aid during closing argument to illustrate the type of weapon that was probably used on the victim. However, the State did not attempt to link the baseball bat to the crime. Dr. McGarry, the forensic pathologist who performed the autopsy on the victim, stated that the victim sustained numerous injuries from a heavy blunt object such as a baseball bat. The defendant testified that he struck the victim with a baseball bat during his struggle with the unknown man. The defendant stated that the bat was left in the house. Detective Phillips testified if the wooden baseball bat *594 had been left in the house, as alleged by the defendant, it probably burned in the fire. The officer stated that he did not locate a baseball bat on the scene. Thus, the jury was aware, from the trial testimony, that the victim had sustained injuries from a baseball bat but that the bat used in the attack had been burned in the fire. The State did not attempt to suggest that the bat held during closing argument was the bat used by the defendant to attack the victim. In light of the jurisprudence discussed above, even if the trial court had admitted the bat into evidence, the error would not have been prejudicial since there was no attempt to link the baseball bat with the actual bat used to attack the victim. There was no error by the trial court when it allowed the State to use the baseball as a demonstrative aid during closing argument.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 2
The defendant also contends that the State did not produce sufficient evidence to prove his identity as the person who murdered Lucille Diane Heim.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. La. R.S. 15:438 is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, supra.
The defendant contends that the State failed to prove that he was the person who killed Lucille Diane Heim. The defendant argues that the circumstantial evidence was not sufficient to prove his identity as the perpetrator.
While there was no eyewitness testimony which identified the defendant as the perpetrator, there was sufficient circumstantial evidence to support the jury's finding that the defendant was the person who killed Lucille Diane Heim. Defendant's own testimony revealed that he was the last person who saw the victim alive. He also admitted to striking the victim several times with a baseball bat. Additional testimony placed the defendant at the house at the time the fire was started.
Dessiere Ford testified that the defendant and the victim were in the house together when Dessiere and Dale left the house at approximately 4:00 p.m. Ms. Ford also stated that the victim had shown Ms. Ford marks on her neck that day at work. She further testified that the defendant was acting strangely that day. He paced from the front of the house to the rear bedroom while she was there. Dessiere's testimony was corroborated by the testimony of the victim's son, Dale Herring. Dale stated that he and Dessiere left his mother's house at approximately 4:00 p.m. and went to Dessiere's mother's house. When he arrived home around 7:00 p.m., there were fire trucks at the house. Dale testified that the defendant and the victim were the only ones in the house when he and Dessiere left.
Leonard Santee, Jr., testified that he lived next door to the defendant and the *595 victim. At approximately 5:00 p.m., he heard thumping noises coming from the defendant's residence. Between 5:30 p.m. and 5:45 p.m., someone knocked on his door and told him that the house was on fire. Charles Henderson, Jr., lived several houses from the defendant and victim. Henderson testified that he was outside when Dale and Dessiere left the defendant's residence. Henderson stated he spoke with them for awhile and went inside approximately ten minutes after they left. Shortly thereafter, Henderson heard someone yell, "fire." He looked outside and saw that defendant's house was on fire.
Vivian and Rose Duncan, the defendant's sisters, testified that the defendant arrived at Vivian's house between 6:30 p.m. and 7:00 p.m. Rose Duncan stated that she was leaving her sister's house when she saw the defendant arrive at Vivian's house on a bike. Rose testified that the defendant appeared nervous and sweaty. His hand was swollen and bleeding. The defendant told her a story about a man entering the house and assaulting him. Rose stated that she did not believe the defendant's story. After Rose left, the defendant went into Vivian's house. Vivian stated that the defendant's hand was swollen and bleeding. Her daughter observed blood stains on the defendant's jeans and asked defendant about the bloodstains. The defendant told Vivian that a man had entered his house and assaulted him. The defendant stated that he left the victim in the house with the man but did not ask Vivian to call 911.
The defendant admitted that he struck the victim with a baseball bat. He stated that an unknown man entered his house and assaulted him. The defendant testified that he and the man engaged in a physical fight during which the man grabbed the baseball bat and struck the defendant. The defendant was able to grab the bat from the man and allegedly accidentally struck the victim as she tried to stop the fight. The defendant admitted striking the victim several times with the bat. The defendant told the police officers and his family members about the unknown man. The defendant stated he gave the police a description of the man and the vehicle the man drove.
However, Sgt. Patterson stated that the State of Louisiana had not issued license plate number given by the defendant. In addition, none of the defendant's neighbors corroborated the defendant's story about the presence of a green Ford Expedition. In fact, all the witnesses stated that they did not see such a vehicle in the neighborhood on the day of the fire. Mr. Henderson, who had been outside for a good part of the afternoon, stated that he did not see a strange man enter the defendant's residence. Dale Herring and Dessiere Ford stated that none of Dale's friends fit the description of the unknown man.
The testimony of the police officers and fire officials also supports the jury's conclusion that the defendant was the person who killed the victim. Dr. McGarry testified that the victim suffered blunt, heavy injuries to her face. He opined that an object, such as a baseball bat, could have caused the injuries. The witness also stated that the victim had been manually strangled. The defendant admitted to striking the victim with the baseball bat. Dessiere Ford testified that the victim showed Dessiere marks on the victim's neck the morning of the murder. Thus, the jury could have reasonably concluded that the defendant was the person who assaulted and beat the victim.
In addition, Sgt. St. Germain stated that arson was the probable cause of the fire. He noted that furniture had been moved in the front room, indicating that a struggle took place. He testified that the fire began in the back bedroom and had been burning for approximately twenty minutes before the fire trucks arrived. Homicide Detective Terry Phillips stated that he searched the residence for the baseball bat described by the defendant. However, the bat could not be found. Detective Phillips *596 testified that the bat was probably burned in the fire. Sgt. Patterson took a statement from the defendant and attempted to corroborate the defendant's story about the unknown man. However, when Sgt. Patterson attempted to run the license plate number given by the defendant, she learned that the State had not yet issued that license plate number.
Given the discrepancies in the defendant's testimony and the fact that none of the witnesses corroborated defendant's story about the unknown man, the jury was within its discretion in choosing not to accept the defendant's story about the unknown man. The testimony was sufficient for the jury to conclude that all reasonable hypotheses of innocence had been excluded. The evidence presented by the State was sufficient to prove, beyond a reasonable doubt, that the defendant was the person who killed the victim. All the evidence indicates that the defendant was in the residence at the time the victim was killed and the fire started.
This assignment is without merit.
Accordingly, defendant's conviction and sentence are affirmed.
AFFIRMED.