| STATE OF LOUISIANA | * | NO. 2023-KA-0780 |
|---|---|---|
| VERSUS | * | COURT OF APPEAL |
| ALEC J. BILLOT | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 549-711, SECTION "L"
Judge Angel Harris
* * * * * *
**Judge Rachael D. Johnson**
* * * * * *

(Court composed of Judge Joy Cossich Lobrano, Judge Rosemary Ledet, Judge
Rachael D. Johnson)

**LEDET, J., CONCURS**

JASON ROGERS
DISTRICT ATTORNEY
BRAD SCOTT
ZACHARY PHILLIPS
ORLEANS PARISH DISTRICT ATTORNEY
619 SOUTH WHITE STREET
NEW ORLEANS, LA 70119

     COUNSEL FOR STATE/APPELLEE


Sherry Watters
LOUISIANA APPELLATE PROJECT
P. O. Box 58769
New Orleans, LA 70158

     COUNSEL FOR DEFENDANT/APPELLANT


**REMANDED IN PART;**
**VACATED IN PART;**
**AFFIRMED IN PART**
**MAY 16, 2025**

*RDJ*
*JCL*

Defendant, Alec J. Billiot, appeals his convictions and sentences for a responsive verdict of manslaughter, conspiracy to commit armed robbery, obstruction of justice, and possession of a firearm by a felon. For the reasons discussed below, we remand this matter to the district court to impose a mandatory fine upon Defendant for his conviction of illegal possession of a firearm by a felon. Additionally, we vacate Defendant's five-year sentencing enhancement imposed for his conviction of conspiracy to commit armed robbery. Further, we vacate Defendant's conviction and sentence for obstruction of justice. In all other respects, Defendant's remaining convictions and sentences are affirmed.

**Procedural History**

This appeal involves Defendant's convictions and sentences for his alleged participation in the attempted armed robbery and murder of Lee Long, Jr. On August 20, 2020, an Orleans Parish Grand Jury indicted Defendant and co-defendants Arec Billiot, Caiden Fruge, and Tyrin Barrazza ("Tank") on 31 counts. Defendant was indicted on 10 of the 31 counts as follows: second-degree murder, a felony in violation of La. Rev. Stat. 14:30.1, Count 1; attempted second degree murder with a firearm upon a known victim, a felony in violation of La. Rev. Stat. 14:(27)30.1,

1

Counts 5-10; obstruction of justice, a felony in violation of La. Rev. Stat. 14:130.1, Count 25; possession of a firearm as a felon, a felony in violation of La. Rev. Stat. 14:95.1, Count 26; and conspiracy to commit armed robbery with a firearm, a felony in violation of La. Rev. Stat. 14:(26) 64.3, Count 28.

In September 2020, the State filed an indictment charging Defendant with nine counts. He was charged with one count each of second degree murder, obstruction of justice, conspiracy to commit armed robbery, possession of a firearm by a felon, and five counts of attempted second degree murder, violations of La. R.S. 14:30.1, 14:130.1, 14:(26)64, 14:95.1, and 14:(27)30.1, respectively. Defendant's brother, Arec, as well as Caiden and Tank were also charged by the same indictment. At his arraignment, Defendant pleaded not guilty to all counts. The State later entered a *nolle prosequi* for Defendant's six counts of attempted second degree murder with a firearm upon a known victim.

On December 9, 2021, Tank filed a motion to sever from the three co-defendants, which the trial court granted. Subsequently, Arec and Caiden jointly moved to sever from Defendant, but their motion was denied. Defendant later filed a motion to sever, which was also denied.

The joint trial of Defendant, Arec, and Caiden began on October 18, 2022, and concluded on October 25, 2022. A jury unanimously found Defendant guilty of the lesser included offense of manslaughter, obstruction of justice, possession of a firearm as a felon, and conspiracy to commit armed robbery.[1]

---

[1] Caiden appealed his convictions of manslaughter and conspiracy to commit armed robbery and his respective sentences. *See State v. Fruge*, 23-0552 (La. App. 4 Cir. 4/11/25), 2025 WL 1088089. Arec, who was found guilty of negligent homicide and first degree robbery, appealed his convictions and sentences therefor in 2023-KA-0529.

On December 9, 2022, the district court sentenced Defendant to 40 years at hard labor for manslaughter, 40 years at hard labor for obstruction of justice, 15 years at hard labor for possession of a firearm as a felon, and 35 years at hard labor plus a five-year firearm enhancement for conspiracy to commit armed robbery to be served without benefit of probation, parole, or suspension of sentence. His sentences were ordered to run concurrently, with the exception of the five-year firearm enhancement.

Following sentencing, Defendant timely filed the instant appeal[2] and assigns two errors for this Court's review: (1) the State failed to prove Defendant guilty beyond a reasonable doubt of conspiracy to commit armed robbery, possession of a firearm as a felon, and obstruction of justice; and (2) the district court erred in imposing constitutionally excessive, maximum, or near maximum sentences, and in illegally enhancing his sentence on the charge of conspiracy to commit armed robbery.

### Statement of Facts and Relevant Trial Testimony

Thirteen witnesses testified at trial on behalf of the State: 1.) New Orleans Police Department ("NOPD") homicide Detective Jaamane Roy, who served as the lead detective on this case; 2.) Sergeant Djuana Adams of the Tulane University Police Department, who was the first law enforcement officer to respond to the scene; 3.) Dr. Aireal Sullivan, an Orleans Parish Coroner's office forensic pathologist who was qualified by the district court as an expert in forensic pathology

---

[2] On November 7, 2024, this Court, finding the record to be incomplete, issued an order staying this matter pending the supplementation of the record with State Exhibit 13. The district court later complied with the order. Thus, on November 26, 2024, this Court lifted the stay and deemed the matter submitted.

and testified to performing of Lee's autopsy and authored the forensic report; 4.) Officer Brett Champagne, a Jefferson Parish probation and parole officer who had been supervising Defendant on active probation since 2018; 5.) John Mai, a Louisiana State Police Crime Lab DNA technician, who examined evidence in this case for the presence of biological substances; 6.) Justin Manuel, Louisiana State Police Crime Lab forensic and DNA analyst, who was qualified by the district court as a forensic DNA analysis expert, who analyzed case samples taken from a Kool cigarette butt, a Luger nine-millimeter cartridge casing and the exterior front door driver's door handle of Lee's vehicle; 7.) Andrew Held, an acquaintance of Lee; 8.) Jack Gordy, an acquaintance of Lee and Defendant; 9-12.) Samantha Del Corral, Emily Whelan, Vivian Nguy and Madeline Cristenberry, who were Lee's friends and back-seat passengers in his car on the night of his murder; and 13.) Aislinn Finnegan-Wilson, Lee's girlfriend and front-seat passenger in his car the night of his murder. Defendant did not present any witnesses.

At trial, the State introduced the following evidence: the 911 call that Aislinn and her friends made during the attack; residential surveillance footage showing the intersection of Hillary and Burthe Streets at the time of the attack; Real Time Crime Center camera footage depicting the location of Bruno's and TJ Quills at the intersection of Maple and Hillary Streets around the time of the incident; an audio and video recorded interview of Caiden; and still photographs, or confirmation photographs, of the suspects taken from the crime scene which were shown to Jack during his interview with the NOPD. The following is a summary of the facts based upon the testimony of the foregoing witnesses and the State's evidence introduced at trial. Adnoid

4

On the evening of January 9, 2020, twenty-year-old Lee and his girlfriend, Aislinn, went out drinking at various bars, namely Bruno's Tavern ("Bruno's"), near Tulane University's campus in New Orleans, with a group of friends, Samantha, Madeline, Vivian, and Emily. In the early morning hours of January 10, 2020, Lee, Aislinn and Emily returned to Lee's pickup truck, which was parked on the corner of Hillary and Burthe Streets. After returning to the truck, Lee left Aislinn and Emily in his truck in search of marijuana.

Jack, Lee's acquaintance, informed Lee that Tank had marijuana. Lee found Tank, who was seated with Defendant, Arec, and Caiden, at Bruno's. Lee bought what he believed to be one gram of marijuana from Tank. However, after walking to his truck and weighing the marijuana, he discovered Tank shorted him by 0.3 grams. He left Aislinn and Emily in his truck again and returned to Bruno's to retrieve the missing marijuana from Tank, who was still seated with Defendant, Arec, and Caiden.

After engaging in a brief conversation, Tank gave Lee the missing quantity of marijuana. Lee hurriedly gathered Samantha, Madeline and Vivian to walk back to his truck with the missing marijuana, to join Aislinn and Emily.

Four men followed Lee, Samantha, Madeline and Vivian to Lee's truck, eventually surrounding the vehicle. Lee was seated in the driver's seat, Aislinn in the passenger seat, with Emily, Samantha, Madeline and Vivian seated in the backseat. Two of the men stood in front of Lee's truck while one man stood by Lee's driver's side door and a fourth man stood near the passenger door on the driver's side. One of the men standing in front of the truck was armed with a firearm that was pointed at the windshield of Lee's truck, and another armed man was positioned at Lee's door. One of the men opened Lee's door, demanding that he empty his pockets.

5

The man argued and fought with Lee. At some point during the altercation, Lee directed Aislinn to hand him a gun that was affixed to the center console. Before Aislinn could hand him the weapon, Lee was shot multiple times, including in his chest, by one of the assailants.[3] The four perpetrators fled the scene, and Lee succumbed to his wounds shortly thereafter.

Lee's girlfriend, Aislinn, recounted that she observed Lee fighting with the perpetrators and tried to retrieve Lee's firearm from its position near the steering wheel; however, she was unable to remove it from its holster. Following Lee's murder, she conducted her own investigation— assisted by her friends and Lee's mother—which resulted in her developing Defendant's name as a possible person of interest in Lee's murder. She discovered Defendant's picture, but could not "independently identify" him as one of the perpetrators. Nevertheless, after figuring out who Defendant's friends were and who he was out with on the night of Lee's murder, she provided that information to the NOPD.

At trial, after watching residential surveillance footage of the intersection of Hillary and Burthe Street, Aislinn identified her voice in the footage screaming and noted that she heard a male voice shouting "open your pockets 'n-word'" that was not Lee's voice. She further observed three persons dressed in black approaching Lee's truck that night, but did not see any of their faces. However, she did recall seeing the person standing in front of the truck pointing a firearm at the windshield of Lee's car, who wore a black hoodie with "white print going across everything." She described the perpetrators to police as "tall, white, and brunette," but clarified

---

[3] Dr. Sullivan testified that Lee suffered six gunshot wounds including two to his chest, which likely caused his death, and the rest to his left arm and left leg.

that her recollection of the perpetrators' appearances was unclear and distorted as this intense event occurred quickly, and she was focused on Lee's safety.

Emily testified that she saw the perpetrators surround the car and witnessed a person pointing a black firearm at Lee's windshield the night of the murder.

Vivian testified that on the night of Lee's murder she walked with Lee towards the Bruno's exit, but Lee then turned towards the patio where she observed him speaking with a group of guys and holding his hand out. She believed the exchange pertained to weed, as she thought Lee had weed in his outstretched hand. She testified that the only person she could identify in the group Lee spoke with was Ross Gonzales.

Vivian then returned to Lee's truck with Samantha, Madeline, and Lee, where Aislinn and Emily were waiting. Vivian testified that once everyone was seated in Lee's truck, Lee's driver's side door was "ripped open" and the perpetrators were pulling Lee out of the truck. She saw a "brunette, white male" armed perpetrator raising a gun at the windshield pointed at everyone in truck, but could not recall his clothing. After ducking behind Lee's seat, she closed her eyes and heard three gun shots. Vivian testified that she could not identify the perpetrators.

Samantha stated that before leaving the bar that night, Lee hurriedly escorted her and her friends to his truck as if "he knew something was about to go down." She recalled what two of the perpetrators who attacked Lee at his car door were wearing: one assailant wore a "black and white 'Champion' T-shirt" covered with Champion logos; and the second assailant wore a black and white hoodie with the hood on. She could see one perpetrator through Lee's windshield "because the lights were on." This perpetrator later relocated to Lee's door because she recalled there were two people standing there when he was shot.

7

Samantha further testified that it was Defendant she witnessed fighting Lee and pulling him out of his vehicle with the assistance of another perpetrator who wore a hoodie. She explained that although she saw Alec with a gun, she saw another perpetrator shoot Lee. Alec was the only perpetrator whose face she could identify. She also testified, however, that she saw co-defendant Arec with the "same group of guys" as Alec inside Bruno's earlier that night. Following Lee's murder, Samantha noticed that Alec was following her Instagram account and his profile picture appeared to depict one of the assailants. She later identified Alec in an NOPD photographic lineup, writing on his photograph "Boy who shot Lee at door with black and white shirt/hoodie."

Madeline testified that while she was with Samantha, Vivian and Lee approached informing them that the group was ready to leave. The four walked to Lee's vehicle, where Emily and Aislinn were waiting. After everyone was seated in the vehicle, Lee's door swung open and she witnessed someone attacking Lee. The truck was surrounded by several people, all of whom appeared to be white males. She could see two people through the windshield, one of whom was pointing a gun at them. Another perpetrator fought with Lee at his car door, while another assailant stood behind that perpetrator at the rear door on the driver's side of the vehicle. She testified that when she tried to exit the vehicle, the perpetrators shut her door to prevent her from leaving.

Madeline recalled that the assailant who fought and shot Lee wore a hoodie with a distinctive black and white pattern, which was the same that she remembered seeing someone wearing earlier in the night seated on Bruno's patio. She recalled that her friends Ross and Jack interacted with the group of men seated on the patio

with the man wearing the hoodie earlier that evening. After the shooting, the perpetrators fled towards Bruno's.

Madeline also testified that after conducting her own independent research into the identities of the perpetrators, she discovered Defendant's name and that his face matched that of the person who wore the sweatshirt on the night of Lee's murder. She informed the police that aside from the assailant wearing a patterned hoodie, the other assailants wore dark clothing. She identified Defendant as the shooter in an NOPD photographic lineup. Defendant was the only assailant she could identify.

Det. Roy, serving as the lead detective in this matter, testified that he arrived at the scene on January 10, 2020.[4] While at the scene, Det. Roy, discovered the following items: three Hornady nine-millimeter casings on the ground as well as an additional Hornady nine-millimeter casing near Lee's arm with two bullet fragments under Lee's body; a Kool brand cigarette butt near Lee's body; and a Goodies cigar wrap. Inside of Lee's truck, the NOPD retrieved a loaded firearm as well as marijuana.[5] He further testified that NOPD detectives located residential surveillance footage from a home near the crime scene and the surveillance footage of Kindred Restaurant and Redd's Tavern.

---

[4] The first law enforcement officer to respond to the scene was retired Sgt. Adams with the Tulane University Police Department, who was patrolling the area near the crime scene on January 9, 2020, when she heard rapid-fire gunshots. Sgt. Adams testified that she radioed in to the dispatcher to request assistance and to notify the NOPD. While attempting to follow the sound of the gunshots, she turned onto Burthe St. where a group of young women flagged her down and informed her that their friend had been shot. She testified at trial that the group of women informed her that the assailants were three to four young white males. Her involvement ended when NOPD homicide detectives arrived on the scene.

[5] Mr. Mai, a DNA technician, explained that he collected and prepared the evidence samples— including a sample from "a partially burnt Kool cigarette butt"— for further analysis, results, and conclusions by DNA analyst Justin Manuel.

During his investigation, Det. Roy interviewed Aislinn, Samantha, Vivian, and Madeline, as well as two other patrons of Bruno's on the night of the murder, Jack and Andrew. Det. Roy's investigation led him to develop Defendant as a suspect and arrange a "six-pack" photographic lineup.[6] An NOPD officer, who was unaffiliated with the investigation, conducted the "six-pack" photographic lineup with Samantha and Madeline, who identified Defendant as one of the perpetrators.

Jack, an acquaintance of Lee as well as of Defendant, Arec and Tank, testified that he saw Defendant, Arec, Tank and Caiden, who was unknown to him, seated together on Bruno's patio the night of Lee's murder. Jack stated that he and Defendant spoke that evening when they exchanged compliments on each other's clothing. Jack complimented Defendant on his "black hoodie with a Champion logo on the front of it."

Jack recounted that Lee became upset with Tank that evening, believing Tank gave him less than the gram of marijuana he purchased. Jack testified that he and Lee parted ways at Bruno's, with each of them walking in a different direction from the bar. Jack was assisting with jumpstarting a friend's car nearby when he witnessed a group of people arguing near where his vehicle was parked. A few minutes later, he heard multiple gunshots ring out near the location of the altercation. Jack decided to move his vehicle, but as he drove back to TJ Quills, he witnessed Defendant and Arec looking "awfully shook up," and crossing the street with Tank and walking "in the opposite direction of the scene." When Jack inquired whether the group was alright and had heard the gunshots, Tank replied, "Why wouldn't we be?" and,

---

[6] Det. Roy testified that a single "confirmation" photograph is shown to a witness who "actually knows the person that they're talking about," whereas a "blind" six-pack photographic lineup is used to identify an unknown suspect.

"What gunshots?", respectively. After watching surveillance footage showing Lee being followed to his vehicle, Jack identified Defendant and Tank, but could not recognize if the third person with the pair was Arec or Caiden. He testified that he provided a statement to NOPD wherein he identified Defendant and Arec in a photographic identification procedure. He also assisted Aislinn and her friends with their investigation.

During his interview of Jack, Det. Roy showed him still photographs of the suspects sourced from surveillance footage. Jack identified Defendant, Tank and Arec.

Andrew testified that he was at Bruno's the night of Lee's murder and that he was an acquaintance of Lee and Jack, but not Defendant and his cohorts. During the course of the night, he witnessed Lee purchase marijuana from Tank on the patio at Bruno's. Andrew testified that Lee was upset about receiving less than the "full gram of weed" he had purchased, but Lee "left it alone." He described Tank as wearing a red sweatshirt, and was sitting at a table with other guys, including one male who wore a "Champion Hoodie." Later that night, as Andrew assisted a friend with jumpstarting a vehicle nearby, Andrew heard "screaming and yelling down the street," followed by several gunshots. Soon thereafter, Andrew saw Tank walking down the street alone in his direction.

Det. Roy ultimately developed three persons of interest who he believed may have been with Defendant on the night of Lee's murder: Tank, Arec and Caiden. Det. Roy testified that he interviewed Caiden and executed a search warrant of his residence, but discovered nothing of evidentiary value. Caiden, however, placed himself, Defendant, Arec, and Tank at the scene of the crime, but denied being involved in Lee's murder.

Regarding the surveillance videos the NOPD obtained, Det. Roy reviewed residential, business and real-time camera footage. The real-time camera surveillance footage showed Lee walking to his truck with Aislinn and Emily, before he returned to Bruno's alone. Later the footage showed Lee walking to his truck with Aislinn's friends while being followed by a group of people. Additionally, real-time camera footage and surveillance footage from establishments in the immediate area of the crime scene showed Defendant, Arec, Caiden, and Tank walking towards Lee's truck at 1:50 a.m., around the time Lee was shot, and fleeing shortly afterwards. Lastly, business surveillance footage showed Lee and Aislinn's friends being followed by a group of people, including one person who was smoking a cigarette, and later the group of perpetrators were seen fleeing the scene.

Det. Roy obtained a warrant for Defendant's arrest as well as search warrants for his residence and to collect a buccal swab of his DNA. Incident to a search of Defendant's residence, the NOPD discovered a firearm inside a vehicle belonging to Defendant's mother. Det. Roy explained that no clothing was retrieved from Defendant's home that matched what witnesses had described.

Forensic and DNA analyst, Justin Manuel, testified that he analyzed case samples taken from a Kool cigarette butt, a Luger nine-millimeter cartridge casing, and the "exterior front driver door handle" of Lee's vehicle, and compared them to reference samples of DNA taken from Lee and Defendant. Only the sample taken from the Kool cigarette butt yielded a result, showing that Defendant's DNA sample corresponded to the DNA profile obtained from the cigarette butt.

Det. Roy stated the murder weapon was not recovered by the NOPD, but his review of the Firearm Examination Report revealed that all of the recovered shell casings were fired from the same weapon. However, none of the casings were fired

from the gun recovered from Lee's vehicle or from Defendant's vehicle. The ballistics report further showed that the bullet fragments recovered from the scene and Lee's autopsy were consistent with nine-millimeter ammunition.

Off. Champagne testified that he supervised Defendant while he was on active probation since October 26, 2018, following Defendant's conviction and sentence to five years of probation for possession of marijuana with intent to distribute. He explained that Defendant was prohibited from possessing a firearm or any dangerous weapons as a condition of his probation.

### Errors Patent

Pursuant to La. C.C.P. art. 920, appellate courts have a duty to review all appeals for errors patent on the face of the record. Our review of the record reveals three errors patent. First, the district court erred in imposing a sentence for the charge of illegal possession of a firearm by a felon without also imposing the statutorily mandated fine, pursuant to La. Rev. Stat. 14:95.1(B)(1). The district court also failed to require that Defendant's sentence for illegal possession of a firearm by a felon be served without the benefit of parole, probation, or suspension of sentence. Further, the district court erred when it included in Defendant's sentence, for conspiracy to commit armed robbery, a five-year sentence enhancement for the use of a firearm during the perpetration of the offense to be served consecutively to the sentence imposed on him under the provisions of La. Rev. Stat. 14:64. *See* La. Rev. Stat. 14:64.3.

Regarding Defendant's sentence for illegal possession of a firearm by a felon, La. Rev. Stat. 14:95.1(B)(1) provides that for defendants who are found guilty of said offense they "shall be imprisoned at hard labor for not less than five nor more than twenty years *without the benefit of probation, parole, or suspension of sentence*

13

and *be fined not less than one thousand dollars nor more than five thousand dollars*." [Emphasis added].

The district court failed to impose the statutorily mandated sentence without benefits and without the requisite fine in the instant matter. Nevertheless, where a district court fails to impose a sentence without benefits, "[t]he failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without benefit of probation, parole, or suspension of sentence." La. Rev. Stat. 15:301.1. Thus, the district court's omission of the denial of benefits of probation, parole, or suspension of sentence does not require a remand. *See State v. Brown*, 09-0884, p. 11 (La. App. 4 Cir. 3/31/10), 36 So.3d 974, 982.

Contrarily, this Court has held that when defendants convicted of illegal possession of a firearm by a felon are not ordered by a district court to pay the mandatory fine reviewing courts "must remand cases for the imposition of a mandatory fine where the trial court failed to do so." *State v. Williams*, 24-0105, p. 8 (La. App. 4 Cir. 10/9/24), 400 So.3d 1194, 1199 (citing *State v. Williams*, 03-0302, p. 3 (La. App. 4 Cir. 10/6/03), 859 So.2d 751, 753). Accordingly, we remand this matter to the district court for the imposition of the statutorily mandated fine.

The third error patent involves the district court's inclusion of a consecutive five-year sentence enhancement in Defendant's sentence for his conspiracy to commit armed robbery conviction, under La. Rev. Stat. 14:64.3. This error is also raised by Defendant in the latter portion of his second assignment of error. He asserts that the firearm sentencing enhancement of five years without the benefit of parole probation or suspension of sentence was illegally imposed because it is inapplicable

to the offense of conspiracy to commit armed robbery. The State concedes that the five-year sentencing enhancement was illegally imposed.

The firearm sentencing enhancement is applicable only when a firearm is used in the commission of armed robbery or attempted armed robbery. However, "[a] criminal conspiracy to commit crime is an inchoate crime separate and distinct from the completed criminal act." *State v. Richards*, 426 So.2d 1314, 1316 (La. 1982). The offense of "conspiracy to commit armed robbery" is excluded from those offenses statutorily eligible for the sentencing enhancement. Thus, we vacate the five-year sentencing enhancement imposed on Defendant pursuant to La. Code Crim. Proc. art. 882.[7]

## Insufficient Evidence

Defendant's first assignment of error is that the State presented insufficient evidence to establish that he is guilty beyond a reasonable doubt of conspiracy to commit armed robbery, illegal possession of a firearm by a felon, and obstruction of justice.

Regarding Defendant's obstruction of justice conviction, however, the State acknowledges that it lacked evidence of Defendant's specific intent to distort an investigation, which is essential to proving that a defendant tampered with the evidence to obstruct justice pursuant to La. Rev. Stat. 14:130.1 (A)(1), and conceded that the record is absent of such evidence. In its brief, the State admitted the record does not support the conclusion that Defendant had the specific intent necessary to establish obstruction of justice where there was a lack of evidence that Defendant

---

[7] "An illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review." La. Code Crim. Proc. art. 882.

removed the firearm he had at the scene with the intent to distort a potential criminal investigation. Despite being able to infer specific intent from a defendant's actions, a defendant's removal of a firearm from a crime scene, without more, is insufficient "to prove beyond a reasonable doubt that [the defendant] possessed the specific intent to distort the police investigation." *State v. Scott*, 23-0022, p. 16 (La. App. 4 Cir. 8/30/23), 372 So.3d 42, 55, *writ denied*, 23-01317 (La. 3/19/24), 381 So.3d 707, and *writ denied*, 23-01318 (La. 3/19/24), 381 So.3d 707. Thus, considering the State's concession and the applicable law, we vacate Defendant's conviction and sentence for obstruction of justice.

Below we review Defendant's convictions for conspiracy to commit armed robbery and illegal possession of a firearm by a felon.

## Applicable Law

In reviewing a claim for insufficiency of the evidence, the United States Supreme Court has held:

> …the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. (Emphasis in original).

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Moreover, this Court has further held that "[c]onflicting statements as to factual matters is a question of weight of the evidence, not sufficiency" for "the trier of fact who may accept or reject, in whole or in part, the testimony of any witness." *State v. Wells*, 10-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306 (internal citations omitted). "The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction." *Id.*

"Pursuant to *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), this court must determine that the evidence, viewed in the light most favorable to the prosecution, 'was sufficient to convince a rational trier of fact that all the elements of the crime had been proved beyond a reasonable doubt.' " *State v. Francis*, 18-0482, p. 3 (La. App. 4 Cir. 12/28/18), 318 So.3d 823, 826 (quoting *State v. Neal*, 00-0674, p. 9 (La. 6/29/01), 796 So.2d 649, 657). The *Francis* Court further explained the requirements for using circumstantial evidence to prove the commission of a crime:

> When circumstantial evidence is used to prove the commission of an offense, "assuming every fact proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. Rev. Stat. 15:438. This statutory test (of La. Rev. Stat. 15:438) "works with the *Jackson* constitutional sufficiency test to evaluate whether all the evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury." *Neal*, 00-0674, p. 9, 796 So.2d at 657 (citation omitted). It is not a separate test from the *Jackson* reasonable doubt standard but, rather, it is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. *State v. Wright*, 445 So.2d 1198, 1201 (La.1984).
>
> A fact finder's decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. *State v. James*, 2009-1188, p. 4 (La. App. 4 Cir. 2/24/10), 32 So.3d 993, 996.

*Id.,* 18-0482, pp. 3-4, 318 So.3d at 826-27.

"Stated differently, 'the reviewer as a matter of law, can affirm the conviction only if the reasonable hypothesis is the one favorable to the state and there is no extant reasonable hypothesis of innocence.' " *State v. Mealancon*, 21-0119, p. 7 (La. App. 4 Cir. 12/22/21), 334 So.3d 792, 798 (quoting *State v. Green*, 449 So.2d 141, 144 (La. App. 4 Cir. 1984) (citation omitted). "If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis falls; and, unless another one creates reasonable doubt, the defendant is guilty." *Id.* (citing *State v. Captville*, 448 So.2d 676, 680 (La. 1984)).

**Conspiracy to Commit Armed Robbery**

Defendant asserts that the State failed to present "evidence of a single conversation, text, or phone call" and therefore, failed to establish that he entered into an agreement "to commit any crime, particularly a robbery, or that any criminal plans were discussed or made." We disagree.

Armed robbery is defined as "taking anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La. Rev. Stat. 14:64.

Criminal conspiracy is "the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that … one or more of such parties does an act in furtherance of the object of the agreement or combination." La. Rev. Stat. 14:26. "The word 'combination' does not obviate the necessity for at least two parties to possess malefic intent for a conspiracy to exist." *State v. Joles*, 485 So.2d 212, 214 (La. App. 2d Cir. 1986). In fact, the "pertinent statute requires criminal intent in the mind of at least two persons, and, of course, an overt act in furtherance of the enterprise, for a conspiracy to exist." *Id.* "This Court

18

has found that direct or circumstantial evidence may be used to prove criminal conspiracy." *State v. Robinson*, 23-0058, p. 28 (La. App. 4 Cir. 9/4/24), 401 So.3d 809, 828, *writ not considered*, 24-01306 (La. 12/27/24), 397 So.3d 1220, and *writ denied*, 24-01198 (La. 2/25/25), 401 So.3d 658 (citing *State v. Hickerson*, 19-1077, p. 16 (La. App. 4 Cir. 12/30/20), 312 So.3d 1124, 1136)).

Additionally, "[s]pecific intent is an essential element of criminal conspiracy". *State v. Toby*, 23-00722, p. 3 (La. 10/25/24), 395 So.3d 831, 834, *reh'g denied*, 23-00722 (La. 12/12/24), 397 So.3d 424. Specific intent is the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. Rev. Stat. 14:10(1).

Louisiana courts have held that circumstantial evidence that the perpetrators intended to commit the underlying offense together is sufficient to show that they agreed. *See Toby*, *supra,* 23-00722, p. 5, 395 So.3d 831, 835 [wherein the Louisiana Supreme Court held that jurors were not foreclosed from inferring from the circumstantial evidence that two brothers conspired to commit murder "[s]imply because there was no direct evidence, such as the precise content of a text message to show an agreement."].

In the instant matter, the testimony and evidence presented at trial reveals that Lee and Tank participated in a botched drug deal that initially prompted Lee to confront Tank— as he was with Defendant, Arec, and Caiden at Bruno's— over the missing quantity of marijuana. However, the situation ultimately escalated when Tank and his cohorts confronted and murdered Lee.

As noted above, following the confrontation with Tank, Lee hurriedly departed Bruno's, quickly gathering his remaining friends to leave with him.

According to Aislinn, Lee returned to his truck with an additional quantity of marijuana. Shortly thereafter, as Lee was seated in his vehicle with Aislinn, Emily, Samantha and Madeline, Lee's truck was surrounded by Defendant, who was armed, along with Tank, Arec and Caiden, one of whom who was also armed. Trial testimony from Aislinn, Samantha, Emily, Vivian and Madeline reveals that at least two of the assailants brandished firearms, one of whom being Defendant who was identified by the distinctive white and black patterned shirt or hoodie that he wore the night of Lee's murder. Furthermore, in an audio recording of the attack that the jurors heard, one of these assailants can be heard demanding Lee to open his pockets.

The testimony and circumstantial evidence supports the rational inference that after a botched drug deal inside Bruno's, Defendant and his associates acted in concert to take something of value located inside of Lee's pockets on Lee's person, when they left the bar as a group, trailed Lee and his friends to Lee's truck, and surrounded the truck armed with at least two firearms to either intimidate or exert force against Lee with the firearms. Defendant's actions as well as those of his cohorts evidence that they collectively acted with malefic intent to rob Lee at gunpoint. This circumstantial evidence is sufficient to constitute an overt act in pursuit of the shared goal of committing the armed robbery of Lee. Accordingly, Defendant's claim that the State failed to present sufficient evidence that he conspired to commit armed robbery is without merit.

**Possession of a Firearm by a Convicted Felon**

Defendant asserts that the State failed to prove that he illegally possessed a firearm due to insufficient evidence. He acknowledges that he is a felon and that several witnesses identified him as one of the assailants at the scene who possessed a firearm. Off. Champagne further testified that Defendant is a felon who is

20

prohibited from possessing a firearm as a condition of his probation. Defendant, however, asserts that the testimony adduced at trial was unreliable and insufficient to support his conviction because the witnesses' testimony conflicted as to whether he was the actual shooter. Defendant further contends the district court should have also rejected the witnesses' testimony identifying the objects the assailants brandished as guns or firearms because that testimony is also unreliable. We disagree.

All five surviving occupants in Lee's vehicle, Aislinn, Samantha, Emily, Vivian, and Madeline, testified unequivocally that they observed one of the perpetrators standing in front of the truck pointing a gun at them through the windshield. The majority of these witnesses further related that this armed perpetrator was a white male who wore a black shirt or hoodie with white Champion logos and that he relocated to Lee's door, attacked and killed him. At trial, Aislinn, Samantha, and Madeline identified Defendant as being armed while wearing a black and white hoodie with "Champion" logos. Samantha and Madeline identified Defendant in the photographic lineup as the shooter. However, when Samantha testified at trial, she stated that someone else actually shot Lee, but that she saw Defendant pointing a gun at the windshield as he wore black and white shirt with "Champion" logos "all over." While Aislinn testified that the person pointing the gun at the windshield was wearing a black hoodie with "white print going across everything," Emily similarly described the same assailant as wearing a "patterned black and white shirt," noting he later relocated to Lee's car door.

Additionally, the State replayed all of the surveillance footage during closing argument, noting each perpetrator's clothing. The State noted that the identity of each assailant depicted in the footage was confirmed by Jack and codefendant,

Caiden, during their police interviews. The State argued that Defendant was depicted as wearing a black and white patterned shirt "with Champion writing all over it," whereas Caiden was described as wearing a "black hoodie with the emblem on the chest," and Arec as wearing "a black buttoned-up shirt." Jack testified at trial that he was familiar with Defendant and identified him as wearing "a black hoodie with a Champion logo on the front of it." The State further noted that Defendant was depicted in surveillance footage smoking a cigarette as his group crept toward Lee's vehicle. Defendant's DNA was determined to be consistent with the DNA recovered from the Kool cigarette butt recovered from the scene.

As noted above, it is the jury's province to determine the credibility of witnesses, resolve conflicts in the testimony, and to weigh all evidence. A reviewing court should not disturb a rational fact-finder's determination unless is incompatible with the physical evidence. Here, the jury concluded that the witnesses' testimony that the assailant—wearing the Champion logo-patterned shirt standing in front of the windshield— pointed a firearm at them was credible. Accordingly, viewing the evidence in the light most favorable to the prosecution, we find that a rational fact-finder could have determined that the evidence presented excluded every reasonable hypothesis of Defendant's innocence. Therefore, the evidence was sufficient to prove that Defendant illegally possessed a firearm. This assignment of error is without merit.

**Excessive Sentences**

Defendant asserts in his final assignment of error that the district court imposed excessive sentences on each of his convictions and failed to consider the sentencing criteria. As discussed above, Defendant was sentenced to 40 years at hard labor for the responsive verdict of manslaughter; 40 years imprisonment at hard

labor for obstruction of justice; 35 years at hard labor for conspiracy to commit armed robbery with a five year sentencing enhancement without benefit of parole, probation, or suspension of sentence; and 15 years at hard labor without the benefit of parole, probation or suspension of sentence for illegal possession of a firearm by a felon.

This Court has already addressed portions of Defendant's claims and errors patent regarding his sentences. In the errors patent discussion above, we determined that Defendant's sentence for conspiracy to commit armed robbery erroneously included a five-year firearm sentencing enhancement pursuant to La. Rev. Stat. 14:64.3 as the statutory sentencing enhancement is applicable to defendants convicted of armed robbery, not conspiracy to commit armed robbery. Therefore, in addressing Defendant's current assignment of error, only Defendants' sentence of 35 years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence will be reviewed.

Additionally, we have already discussed the error patent that the district court failed to impose upon Defendant the statutorily mandated fine for the conviction of illegal possession of a firearm by a felon. Accordingly, this Court is remanding to the district court for the imposition of the fine.

Further, as previously discussed, because the State concedes that it produced insufficient evidence of Defendant's specific intent to sustain his conviction for obstruction of justice, this Court vacates his conviction and sentence on this count. Therefore, any discussion of Defendant's potentially excessive sentence for his obstruction of justice conviction is now moot. We focus our review below on Defendant's sentences for manslaughter, conspiracy to commit armed robbery and illegal possession of a firearm by a felon.

23

## Standard of Review and Applicable Law

The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. Code Crim. Proc. art. 881.4(D). However, the imposition of a sentence within the statutory range may still violate a defendant's constitutional right against excessive punishment. *State v. Mangrum*, 23-01609, p. 4 (La. 10/25/24), 395 So.3d 765, 768 (citation omitted). When a sentence makes no measurable contribution to acceptable goals of punishment, it is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime sentence, it is unconstitutionally excessive. *State v. Ambeau*, 08-1191, p. 9 (La. App. 4 Cir. 2/11/09), 6 So.3d 215, 221. Thus, "[t]he relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. Mathieu*, 18-964, p. 4 (La. App. 3 Cir. 11/6/19), 283 So.3d 1041, 1045 (citing *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957).

"In reviewing a sentence[,] the appellate court may consider the record of the case which shall include any evidence or relevant information introduced at preliminary hearings, hearings on motions, arraignments, or sentencing proceedings, and any relevant information included in a presentence investigation report filed into the record at sentencing." La. Code Crim. Proc. art. 881.3. "In considering the nature of the offense, both the trial court and reviewing court may assess whether the crime for which defendant has been convicted adequately describes his conduct when the conviction is for a lesser included responsive offense to the crime charged[,]" while "accord[ing] paramount importance to the nature of the conduct proved at trial." *State v. Lewis*, 09-1404, pp. 7-8 (La. 10/22/10), 48 So.3d 1073, 1077-78.

In the instant case, Defendant asserts "insubstantial" evidence was presented against him at trial; thus, he argues the imposition of the maximum sentence for manslaughter as well as his sentences imposed for his convictions of conspiracy to commit armed robbery and possession of a firearm by a felon are disproportionate to his conduct. We disagree and, for reasons that follow, we find no abuse of the district court's discretion.

**Manslaughter**

Defendant was convicted of manslaughter as a responsive verdict to the charge of second degree murder and received the maximum sentence of 40 years at hard labor for that charge. *See* La. Rev. Stat. 14:31(B). Second degree murder is defined in pertinent part as "the killing of a human…when the offender is engaged in the perpetration of or attempted perpetration of…armed robbery…even though he has no intent to kill or to inflict great bodily harm." La. Rev. Stat 14:30.1. "Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." La. Stat. 14:30.1(B).

Manslaughter is defined in pertinent part as:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.

La. Rev. Stat. 14:31.

In the instant matter, notwithstanding the jury's responsive verdict of manslaughter, no extenuating evidence was presented that the offense was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection pursuant to La. Rev. Stat. 14:31(3). As discussed above, the record supported Defendant's possible conviction for second degree murder due to his participation in hunting Lee down with a firearm to rob him, but then killing Lee when he would not surrender the contents of his pockets to Defendant and his cohorts. However, the district court—as a result of the jury's responsive verdict— was permitted to consider the significant reduction in the statutorily allowable punishment. *See State v. White*, 48,788, p. 4 (La. App. 2 Cir. 2/26/14), 136 So.3d 280, 282 [where the Second Circuit determined that evidence presented at trial supported a second degree murder verdict and further held that the sentencing court may take into consideration the great benefit the defendant derived from the jury's return of the lesser verdict of manslaughter]. Defendant greatly benefited here by being convicted of manslaughter instead of second degree murder and, therefore, being sentenced to 40 years at hard labor rather than of life imprisonment. This assignment of error is without merit.

**Illegal Possession of a Firearm by a Felon and Conspiracy to Commit Armed Robbery**

The district court sentenced Defendant to 15 years at hard labor without the benefit of parole, probation or suspension of sentence for illegal possession of a firearm by a felon and 35 years at hard labor for conspiracy to commit armed robbery. Pursuant to La. Rev. Stat. 14:95.1(B)(1), the maximum sentence for a defendant found guilty of illegal possession of a firearm by a felon faces is "twenty

26

years without the benefit of probation, parole, or suspension of sentence and be fined not less than one thousand dollars nor more than five thousand dollars."[8]

Moreover, a defendant found guilty of conspiracy to commit any crime not punishable by death or life imprisonment shall not exceed one-half of the largest fine, or one-half the longest term of imprisonment prescribed for the offense contemplated, or both. La. Rev. Stat. 14:26(D). Therefore, the maximum sentence allowable for conspiracy to commit armed robbery would be forty-nine-and-a-half years as armed robbery carries a maximum sentence of imprisonment of "not more than ninety-nine years" pursuant to La. Rev. Stat. 14:64(B).

Here, the district court imposed a sentence of 35 years imprisonment at hard labor, which is in the upper range of sentences for conspiracy to commit armed robbery. Similarly, Defendant's sentence of 15 years imprisonment at hard labor for illegal possession of a firearm by a felon is near the upper range of the maximum allowable sentence of not more than twenty years. Maximum or near maximum sentences are generally reserved for the worst offenders and the worst offenses. *State v. Quebedeaux*, 424 So.2d 1009, 1014 (La. 1982). Considering that it was established at trial that Defendant and his co-defendants, acting in concert, stalked Lee as he walked to his vehicle before ambushing him, holding him and his friends at gunpoint before shooting and killing Lee over 0.3 grams of marijuana, we find no abuse of the district court's vast discretion in sentencing Defendant on these two counts.

---

[8] As explained above, this Court is remanding this matter in part because the district court failed to impose a mandatory fine against Defendant for the charge of illegal possession of a firearm by a felon without also imposing the statutorily mandated fine, pursuant to La. Rev. Stat. 14:95.1(B)(1).

**Sentencing Criteria**

Lastly, Defendant asserts that the district court erred in failing to consider the sentencing guidelines provided in La. Code Crim. Proc. art. 894.1, which provides in pertinent part:

A. When a defendant has been convicted of a felony or misdemeanor, the court should impose a sentence of imprisonment if any of the following occurs:

(1) There is an undue risk that during the period of a suspended sentence or probation the defendant will commit another crime.
(2) The defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution.
(3) A lesser sentence will deprecate the seriousness of the defendant's crime.

B. The following grounds, while not controlling the discretion of the court, shall be accorded weight in its determination of suspension of sentence or probation:

(1) The offender's conduct during the commission of the offense manifested deliberate cruelty to the victim.

. . .

(5) The offender knowingly created a risk of death or great bodily harm to more than one person.
(6) The offender used threats of or actual violence in the commission of the offense.

. . .

(10) The offender used a dangerous weapon in the commission of the offense.

. . .

(13) The offender was a leader or his violation was in concert with one or more other persons

28

with respect to whom the offender occupied a position of organizer, a supervisory position, or any other position of management.

. . .

(18) The offender foreseeably endangered human life by discharging a firearm during the commission of an offense which has, as an element, the use, attempted use, or threatened use of physical force against the person or property of another, and which, by its very nature, involves a substantial risk that physical force may be used in the course of committing the offense.

(19) The offender used a firearm or other dangerous weapon while committing or attempting to commit an offense which has, as an element, the use, attempted use, or threatened use of physical force against the person or property of another, and which by its very nature, involves a substantial risk that physical force may be used in the course of committing the offense.

. . .

(21) Any other relevant aggravating circumstances.

"The Louisiana Supreme Court has held that although Article 894.1 provides useful guidelines for the determination of the nature and length of a sentence, compliance with its provisions is not an end in itself." *State v. Dauzart*, 11-0688, p. 13 (La. App. 4 Cir. 3/21/12), 89 So.3d 1214, 1222-23 (citing *State v. Wimberly*, 414 So.2d 666, 671-72 (La. 1982)). The *Dauzart* Court further explained that La. Crim. Code Proc. art. 894.1's guidelines are not to be strictly construed where the content of a record is sufficiently detailed to provide an adequate factual basis for the district court's sentencing:

29

> Article 894.1 is intended to provide an impartial set of guidelines within which the trial judge's sentencing discretion may be exercised. *State v. Price*, 403 So.2d 660 (La. 1981); *State v. Douglas*, 389 So.2d 1263 (La. 1980). Compliance with Article 894.1 further provides a record which is detailed enough to allow for a reasoned review of allegedly excessive sentences. The articulation of the factual basis for a sentence is the goal of Article 894.1, not rigid or mechanical compliance with its provisions. A remand is unnecessary where the record clearly shows an adequate factual basis for the sentence imposed, even where there has not been full compliance with Article 894.1. *State v. Boatright*, 406 So.2d 163 (La. 1981).

*Id.*, 11-0688, p. 13, 89 So.3d at 1223.

In the matter *sub judice*, the district court did not recite into the record what factors it considered in determining Defendant's sentence; rather, the court declared its intent for Lee's family to receive "some type of closure" after enduring such an emotional process. The record evidences that the district court had ample evidence to consider when applying article 894.1, such as victim impact statements and court-ordered pre-sentencing investigations reports for Defendant and his co-defendants.

Here, several of the eyewitnesses and members of Lee's family provided victim-impact statements in a series of letters to the district court, expressing their disappointment in the jury's verdicts, and imploring the sentencing court to impose the maximum allowable sentences on all charges.

Several of the aggravating factors provided in La. Code Crim. Proc. art. 894.1 are applicable to Defendant's conduct in this case as Defendant was armed with a firearm and created a risk of death or harm to everyone inside

Lee's vehicle when he pointed a gun at the windshield, before moving to Lee's open car door to physically attack Lee and threatened Lee while armed. Defendant used force or threatened to use force while demanding the contents of Lee's pockets, which resulted in Lee's death.

Additionally, the imposition of a lesser sentence against Defendant "would deprecate the seriousness" of Defendant's crime of murdering Lee during an armed robbery, especially considering he was already a convicted felon when this crime occurred. La. Code Crim. Proc. art. 894.1(A)(1) and (A)(3). Defendant is deserving of lengthy imprisonment sentences for his convictions in this matter as a recidivist with a demonstrated predisposition for committing crime.[9] Accordingly, because the record in this case shows adequate factual support for the sentences imposed for manslaughter, possession of a firearm by a felon and conspiracy to commit armed robbery, we find Defendant's assignment of error is without merit.

## DECREE

For the foregoing reasons, we remand this matter for the district court to impose a mandatory fine upon Defendant for his conviction of illegal possession of a firearm by a felon. Additionally, we vacate Defendant's five-year sentencing enhancement imposed for his conviction of conspiracy to commit armed robbery. Further, we vacate Defendant's conviction and sentence for obstruction of justice. In all other respects, Defendant's remaining convictions and sentences are affirmed.

---

[9] As noted above, Off. Champagne testified that Defendant was sentenced to five years of probation for possession of marijuana with intent to distribute and that he had been supervising Defendant on active probation for over a year prior to Lee's murder.

**REMANDED IN PART;**
**VACATED IN PART;**
**AFFIRMED IN PART**

32